The plaintiff is the widow of John Lewis (Bud) Woodward who died on August 11, 1937, as she alleges, from creosote poisoning and poison ivy or poison oak contracted while he was working for the defendant company in building or repairing a bridge for the Kansas City Southern Railway Company near DeQuincy, Louisiana. She sues for herself and a minor child, issue of her marriage with the deceased, to recover compensation in the sum of $6,000, being compensation for the period of 300 weeks at the rate of $20 per week, plus an additional sum of $250 for medical and hospital expenses. Her cause of action is stated in her petition as follows: "The deceased, John Lewis Woodward, while working within the scope of his employment had received cuts, bruises and lacerations on his hands, arms and other exposed portions of his body, and that he had also come in contact with Poison Ivy, or Poison Oak, which had caused a breaking out or irritation of the surface of the skin and while in said cut, bruised, lacerated and irritated condition he was further poisoned by coming in contact with poisonous ingredients of creosote which brought about a Dermatitis condition, which later caused his death on the 11th day of August, 1937."
The defendant denied that the deceased died from the effects of poison ivy or poison oak and creosote poisoning. While the defendant did not so allege in its answer, it undertook to prove on the trial of the case that the deceased died from arsenical poison resulting from injections of neoarsphenamine given in the treatment of what was thought to be syphilis by the doctor giving the injections, and before it was ascertained that the deceased was not affected with this disease. The plaintiff has appealed from a judgment which rejected her claim.
In the latter part of June and during the first half of July, 1937, the deceased was *Page 222 
helping build or repair a bridge with creosoted timbers. According to the testimony of several coemployees of the deceased, it was his duty to handle timbers which had been treated with creosote and which timbers had been lying on the railroad right of way for some time and had become partly covered with poison oak vines; that it was necessary for the men to remove these vines in handling the timbers, and several of the men, including the deceased, received creosote burns and oak poisoning on the exposed parts of their hands, face, neck and arms, and the deceased broke out with a rash or skin eruption which they thought was poison ivy or poison oak; that the creosote got in these burns and bruises on his hands, arms and face and his skin became irritated and swollen to such an extent that he could not wear his gloves and had to quit work about the middle of July.
Dr. A.E. Douglas examined plaintiff for the defendant company, and, according to the report made of that examination, dated July 2, 1937, this doctor found nothing wrong with the deceased at that time. The records of the defendant company show that the deceased went to work for it on June 21, 1937, and it is not clear as to why this pre-employment examination report is dated more than ten days later, unless it is possible, as the doctor suggests, that the report was not made out until several days after the examination was made. In any event, it is clear from the testimony of this doctor and other evidence in the record that there was nothing wrong with the deceased when he began work for the defendant.
While we are unable to fix from the evidence just when the dermatitis first appeared on the body of the deceased, yet from the testimony of practically all the witnesses who testified on this point, it is certain that this rash or skin irritation did not show up until several days after the deceased began working for the defendant — in any event not before the last of June or the early part of July, there being considerable testimony that it developed after July 6th. The trouble had become so serious by the middle of July that he was forced to get medical treatment and was confined in the Lyons-Douglas Clinic at DeQuincy from July 19th until he died on August 11th. On July 16th, Dr. Douglas made out a certificate to the effect that the deceased had had an attack of oak poisoning and was very sore and could not work for several days.
Two nurses who treated the deceased while he was in the clinic testified that his whole body was covered with blisters which resembled burns from which a watery fluid ran, and the skin would slough off. The skin irritation had more the appearance of blisters resulting from burns than a rash; but there was no sign of burns. The skin eruption spread more and more over his body until it affected the soles of his feet and the hair of his head before he died. It appears from the evidence that there was a rather general impression among the doctors and nurses at the clinic that the deceased was suffering from creosote and oak poison, one or two witnesses testifying that Dr. Douglas stated that it was the worst case of creosote and oak poisoning that he had ever seen or heard of.
A few days after the death of the deceased, Dr. Douglas made out a report and bill for the defendant company in which he diagnosed the disease from which the deceased died as "exfoliative dermatitis from irritation of creosote and secondary infection oak poison". And a few days later he made out a death certificate in which he gave the principal cause of death as exfoliative dermatitis and septicemia with contributory causes of creosote oak poisoning and arsenic irritation. In this certificate the doctor described the death as accidental and gave the date of the accident as July 14, 1937.
Notwithstanding that Dr. Douglas had made out all these reports and had expressed his opinion in unmistakable language that the deceased had died from creosote and oak poisoning, when this case came on for trial he took the stand and gave it as his opinion that the deceased died from the effect of arsenical poisoning resulting from the injections which he (Dr. Douglas) had given the deceased for what he thought was syphilis. The doctor gave three, four or five of these injections beginning about June 20th and ceased giving them when he received a report from the State Chemist on a Wasserman test which proved negative. A copy of this report is in the record and is dated June 24, 1937, and as this report must have been received by the doctor within a few days after its date, it is to be presumed that he gave no more of these injections after the latter part of June. *Page 223 
Under this situation, we are at a loss to understand just how the report of the pre-employment examination made by this doctor and contained in his report of July 2d showed that the deceased had no venereal or other disease. Nor do we understand how this doctor for more than a month thereafter and long after the deceased had died continued to give in his reports and express in his opinions that the deceased was affected with creosote and oak poisoning, and made no mention of arsenical poisoning as the principal trouble. The doctor attempts to explain this inconsistency by stating that he did not want to cast any reflection on the deceased or embarrass his family by reporting the fact that these treatments had been given under the belief that the deceased had syphilis. But as the test had proved negative, there was no occasion for withholding a fact that, instead of reflecting unfavorably on the deceased and his family, would have had the opposite effect. As a further evidence that Dr. Douglas believed that the deceased had creosote and oak poisoning, he treated him for that condition until he died.
Dr. G.E. Barham testified as an expert for the plaintiff. He made himself familiar with the evidence in the case as to the symptoms of the deceased, his exposure to creosote and oak poisoning while working with the creosoted timbers, as well as the injections of neoarsphenamine by Dr. Douglas, and gave it as his opinion that the deceased had an inflammatory reaction from poison oak and creosote. He says that creosote burns are usually localized within the area affected, but he says that oak poison is progressive and may spread over all parts of the body. He states further that poison ivy produces blisters and highly involved reactions of the skin, and he has known of it producing death. He did not think arsenical injections would produce the kind of blisters and skin reactions which the deceased had, and stated that a person with oak poison coming in contact with creosote would cause an aggravation of the condition and the reaction would be more severe by coming in contact with an additional irritant.
Dr. Barham gave it as his opinion that poison ivy can be conveyed to various parts of the body through the blood stream or lymph system. He says that arsenical poisoning usually develops in twenty four to forty eight hours, the maximum being eight or nine days. Therefore, if the last injection of arsenic given the deceased was the latter part of June, and the skin eruptions appeared after the 6th of July as most of the testimony indicates, it is hardly reasonable to conclude that the arsenical injections caused the irritations. The maximum of eight or nine days being the third stage of the dermatitis, the first and second stages would appear several days earlier.
Dr. Howell, a witness for the defendant, admits that poison ivy begins at the point of contact and spreads voluminously and may cover the entire body; that it is a progressive spread. He says that poison ivy causes blisters from fluid formations under the skin, and he had seen only three cases of arsenical poisoning and only one of these had blisters, the usual symptoms being a kind of mealy rash on the skin. He admits that it is difficult to distinguish at times poison ivy from arsenical poisoning. While Dr. Howell from hypothetical questions put to him indicates that his opinion was that the deceased was affected with arsenical poisoning, yet a reading of the questions on which he based his opinion convinces us that he was not made familiar with all the symptoms in connection with the deceased and his exposure to possible sources of poison. For instance, he assumes that the dermatitis broke out suddenly over all parts of the body in which case he states that the cause must be systemic (in the blood stream) whereas the evidence shows that the irritation first began on the exposed parts of his body and spread progressively to other parts, as the doctor states is the usual case with oak poison.
Dr. Hatchette, a witness for defendant, gave it as his opinion from hypothetical questions that the deceased died from the effects of arsenical poisoning. He based that opinion on the assumption that the skin affection was systemic and developed over the entire body at once. As already stated, we think his opinion, while probably medically correct, was based on an assumption not borne out by the record and with which he was not familiar. This doctor disagrees with both Dr. Howell and Dr. Barham that ivy or oak poison may spread over all parts of the body from the point of contact.
Dr. Lyons, an associate of Dr. Douglas in the Clinic, did not examine the deceased but saw him a few times while he was in the Clinic. He first thought the deceased *Page 224 
had ivy or oak poisoning as did his associate, Dr. Douglas, but expressed the opinion at the trial that he had arsenical poisoning.
From the record as we read it, we are of the opinion that a decided preponderance of the evidence, lay and medical, shows that the deceased died from the effects of creosote and ivy or oak poisoning contracted while working on a bridge for the defendant company. The fact that he did get creosote burns from the creosoted timbers while handling them during extremely hot weather is proven beyond question. It is also shown to a legal certainty that he was exposed to ivy or oak poison by handling timbers partly covered with poison vines, and it is further shown that while he was working on this job he broke out with a skin affection which spread progressively over his body and became so severe that he was forced to quit work. The opinion of the doctor who treated him was that of creosote and oak poisoning and treatments were given for that condition until death occurred, and we think the symptoms and condition of the deceased are consistent with the prevailing medical opinions relative to the symptoms and effects of ivy or oak poisoning.
If Dr. Douglas gave the arsenical injections in the quantity as he states, there is no explanation given as to why these injections would cause the deceased to have the condition with which he was afflicted. It does not appear that he was given an excessive quantity and we are sure that the doctor who gave the treatment used the proper methods and usual quantity and it must be assumed that under ordinary conditions no bad effects would result from the treatment. If, however, these injections only contributed to the aggravation of the creosote and oak poison, or vice versa, in any event, the creosote and oak poison was a contributing factor producing the fatal results and would still be considered as accidental and a compensable injury. Cannella v. Gulf Ref. Co., La.App., 154 So. 406.
The record shows that medical and hospital bills of $230.80 were incurred for which the defendant is liable.
For the reasons assigned, it is ordered that the judgment appealed from be and the same is hereby annulled and reversed; and it is now ordered, adjudged and decreed that the plaintiff for herself and in behalf of her minor child do have and recover of the defendant compensation at the rate of $20 per week for a period of 300 weeks, beginning with the first payment due August 18, 1937, with interest at the legal rate from their respective due dates until paid, and for the further sum of $230.80 for medical and hospital expenses, with like interest thereon from August 11, 1937, until paid, and for all cost of the suit.