546 So.2d 138 (1989)
Sedonia W. SPARKS
v.
TULANE MEDICAL CENTER HOSPITAL AND CLINIC.
No. 89-C-0077.
Supreme Court of Louisiana.
June 19, 1989.
Rehearing Denied September 11, 1989.
*139 Edward Rodrigue, Robert Baudouin, Boggs, Loehn & Rodrigue, New Orleans, for applicant.
Dale Wilks, New Orleans, for respondent.
CALOGERO, Justice[*].
The Louisiana Worker's Compensation Act provides coverage to any employee who suffers "personal injury by accident arising out of and in the course of his employment." La.R.S. 23:1031 (emphasis added). We have previously determined that mental injury induced by physical trauma and physical injury induced by mental stress are compensable "personal injuries" under the Act.
The primary issue presented in this case, heretofore not addressed by this Court, is whether a mental injury induced by mental stress is compensable when it is caused by a significant employment incident and is not accompanied by any apparent signs of physical trauma.
Plaintiff Sedonia Sparks seeks worker's compensation benefits from her employer, Tulane Medical Center, on the ground that threats by co-employees against her personal safety, made after she had already been the victim of a number of incidents of harassment and vandalism perpetrated by co-employees, caused her to suffer a disabling mental injury. After trial on the merits, the district court denied her claim for benefits. The trial judge found that the *140 plaintiff did in fact suffer a temporarily disabling mental injury, but denied her claim for the reason that there was no "accident" under La.R.S. 23:1031. The court of appeal reversed and awarded plaintiff benefits for a five month period of disability. 537 So.2d 276 (La.App. 4th Cir. 1988). We granted this writ to review the judgment of the court of appeal. 538 So.2d 580 (La.1989).
We now affirm the court of appeal judgment awarding plaintiff worker's compensation benefits. We find that plaintiff proved by a preponderance of the evidence that she suffered a disabling injury which was caused by an "accident," i.e., an unexpected and sudden employment incident. As further discussed below, we also find that plaintiff's mental injury is compensable even though it was not accompanied by any apparent signs of physical trauma.

(I) FACTS
Plaintiff was hired by Tulane Medical Center in 1980. Her initial employment position was "exchange card supervisor," and her duties related to distribution of medical supplies throughout the medical center complex. In 1984 she was promoted to manager of the hospital's distribution center, a position which required her to supervise about ten employees. She held that position until April 6, 1987, when she stopped working because of the injury complained of in this lawsuit.
On April 6, 1987, plaintiff learned that her personal safety had been threatened by other employees at the medical center. The testimony was as follows regarding a series of unusual events leading up to the threats and the manner in which the threats were conveyed to her.
Shortly after plaintiff first began working at the medical center, she observed that other employees were smoking marijuana on a regular basis in the medical supply storeroom. She took steps to try to eliminate this practice, including talking with her supervisor and establishing a designated smoking area. These efforts caused resentment among some of her co-employees. On another occasion she observed an employee, Calvin Green, exchanging a small white package with a woman. Believing that this may have been an illegal drug exchange, she warned Green about using drugs on the premises.
As early as 1982, theft of property from the storeroom, including some property belonging to plaintiff, became a frequent occurrence. On at least two occasions someone stole all of the employee timecards. On other occasions someone urinated in plaintiff's coffee pot and in an office waste basket. There were also incidents of vandalism in which water was poured into supply bins, ruining medical supplies.
Plaintiff's testimony as to these events was corroborated by the testimony of other employees and reports from the medical center's security office. While the incidences of vandalism and theft were spread over a period of years, they occurred with disturbing frequency and regularity. Many of the events appeared to be designed to harass or intimidate plaintiff. As far as can be ascertained from the record, the persons responsible were not apprehended.
The record reflects that by April, 1987, there was increasing tension between plaintiff and one Eddie Spillers, the supervisor of the weekend crew which worked in the storeroom. The weekend crew was responsible for stocking the shelves of the supply room with supplies that would be needed for the following week. Plaintiff believed that the weekend workers were not doing their jobs and said so openly at a staff meeting held sometime during the week preceding Monday, April 6, 1987. The weekend employees resented plaintiff's complaints. On the weekend of April 4-5, 1987, two of the weekend employees, Calvin Green (the employee plaintiff had previously confronted about drug use) and Terry Givens, decided to "protest" against plaintiff by not stocking the shelves of the supply room.
Upon arriving at work on Monday April 6, 1987 and discovering that the weekend workers had not stocked the supply room, plaintiff met with Spillers and her supervisor, *141 Harold Davis. Davis indicated that the employees who stocked the shelves should be suspended for five days. Plaintiff testified that Spillers then told her that if the employees were suspended, "they were really going to get me." Spillers did not remember using those words but did recall telling plaintiff during this meeting that "a lot of people around here want to kick your butt." Spillers testified that when he told plaintiff this, he was referring to the fact that he had overheard other employees threatening plaintiff. At trial, he could not, or would not, identify those employees by name.
Plaintiff testified that she was very frightened and upset upon learning that other employees had threatened her safety. She took seriously the possibility that the week-end employees, one of whom she had confronted regarding illegal drug use in the past, would "get her" if they were suspended. Plaintiff asked Davis to report to security the fact that threats had been made. He refused to do so. Plaintiff then took it upon herself to report the threats to security.
At around noon that day (April 6, 1987) plaintiff left work, complaining that she was too upset to perform her duties. She also testified that she was experiencing severe headaches. She went home and was unable to sleep. Her headache continued. The next day she called Dr. Dwight Green, an internist who had treated her on a few previous occasions for sinus headaches.
Dr. Green testified that plaintiff was crying and upset when she called him on April 7. He examined plaintiff later that day and she related to him that she "was having some stress problems due to confrontations with certain people at work," and that she felt she was being harassed because she had reported some employees for not doing their jobs properly. Dr. Green's diagnosis was that plaintiff "was suffering from tension headaches, which were probably related to a depressive reaction she had as a result of the stress she was encountering at work." Dr. Green prescribed anti-anxiety medication and non-narcotic medication for the headaches. He recommended that plaintiff rest at home for one or two weeks before returning to work.
Two weeks later Dr. Green saw plaintiff for a follow-up visit. She had not returned to work and was still complaining of headaches, as well as depression, insomnia and loss of appetite. Dr. Green referred her to a psychiatrist, Dr. Roniger, for treatment of her continuing depression. Dr. Green later saw plaintiff for seven follow-up visits, the last of which was October 13, 1987. Dr. Green expressed the opinion that plaintiff's tension headaches were related to whatever problems she was having at work. He also expressed the opinion that plaintiff was "not able to function" or work during the period that he treated her (April-October, 1987) because of severe tension headaches.
Dr. Roniger testified that he examined plaintiff on two occasions, May 1, 1987 and May 19, 1987. Plaintiff told him that she had been under stress at work which made her feel "helpless and afraid." She also complained of headaches and other symptoms that had been noted by Dr. Green. Dr. Roniger performed a mental status examination on plaintiff and reached the conclusion that she was suffering from an "adjustment disorder," a condition which he described as a depressed mood arising from difficulty adjusting to a specific situation that is particularly stressful. Dr. Roniger felt that this condition was "definitely job related" and was serious enough to warrant extensive counselling. He referred her for counselling to one of his assistants, Emily Jahncke, a clinical social worker. Dr. Roniger felt that plaintiff was disabled by "whatever was happening to her at her place of work," although he was unsure of the duration of her disability because he only saw her on two occasions.
Ms. Jahncke counselled plaintiff on a regular basis from April through October, 1987. She testified that plaintiff told her that she had been threatened at work. Ms. Jahncke observed that in the initial stages of treatment, plaintiff was so upset that she could hardly walk. Plaintiff told Ms. Jahncke that she was very depressed, had constant headaches, was not sleeping well *142 and was having nightmares. Plaintiff related these problems to her employment, explaining that she had been so frightened by events there that she had stopped working and was staying at home, spending most of her time on her sofa. Ms. Jahncke testified that plaintiff's condition slowly improved with counselling and that she was probably capable of returning to work by September 30, 1987. Ms. Jahncke expressed the opinion that plaintiff's condition was work-related and that she was not in any condition to work prior to September 30, 1987.
The defendant did not present any medical witnesses. Defendant did establish through certain witnesses and medical records that plaintiff was diagnosed with depression in 1970, apparently in connection with an unwanted pregnancy, and that she was treated in 1985 for sinus headaches. In February, 1986, plaintiff made one visit to a physician complaining of headaches following an apparent blow to the head, but there is no indication in the record that she ever required or received any additional treatment for that condition. Dr. Green testified that in his opinion the headaches for which he treated plaintiff after April 6, 1987 were tension headaches, not sinus headaches or headaches caused by physical trauma.
In summary, then, we have a plaintiff who was diagnosed with a psychological adjustment disorder, depression and tension headaches, and who also complained of anxiety, loss of appetite, insomnia and nightmares. Three experts, an internist, a psychiatrist and a clinical social worker, related these problems to plaintiff's employment. Defendant presented no medical testimony but attempted to establish that plaintiff had pre-existing medical problems.

(II) LAW AND ANALYSIS
Defendant argues that there are a number of reasons why the events described above do not provide a basis for recovery under the Louisiana Worker's Compensation Act. First, defendant argues that plaintiff did not prove that her injury resulted from an "accident" as that term is defined in the Act, because there was no "unexpected or unforeseen event happening suddenly or violently ... and producing at the time objective symptoms of an injury." La.R.S. 23:1021(1). Secondly, defendant argues that because any injury suffered by plaintiff was not induced by physical trauma, there was not a compensable injury under the Act which involved "violence to the physical structure of the body." La.R.S. 23:1021(7). As a third and alternative contention, defendant argues that even if injuries are compensable absent evidence of physical trauma, this plaintiff failed to show that her medical problems were causally related to her employment.
In considering these arguments, we will first examine the Act's definitions of "accident" and "personal injury," the manner in which those terms have been interpreted by our jurisprudence, and the question of whether a disabling injury may be compensable in the absence of apparent physical trauma. We will then consider whether the plaintiff proved by a preponderance of the evidence that she suffered a compensable "accident by injury" under the Act.
(A) The Accidental "Event" Requirement
La.R.S. 23:1021(1) defines "accident" as "an unexpected or unforeseen event happening suddenly or violently, with or without human fault, and producing at the time objective symptoms of an injury."
The "event" which qualifies as an accident can be and often is a forceful and readily identifiable occurrence which causes injury to the employee, e.g., an automobile collision, a fall, an explosion, an assault, etc. However, under the jurisprudence, the sudden and unexpected appearance of a physical injury, such as a heart attack or stroke, is also viewed as an "accident." See, e.g., Ferguson v. HDE, Inc., 270 So.2d 867, 869-70 (La.1972) (stroke). In such cases, the onset of the illness or injury is viewed as the accident because, from the employee's perspective, the injury was an unforeseen event which occurred suddenly or violently. Ferguson v. HDE, Inc., supra, 270 So.2d at 870.
*143 The "event" which triggers coverage, then, may be an unexpected and sudden or violent occurrence which causes injury, or it may be an unexpected change in the employee's physical condition which renders him incapable of working, a change caused at least in part by an employment incident. See Malone & Johnson, 13 Louisiana Civil Law Treatise, Worker's Compensation, § 214 (1980 & 1989 Supp.).[1]
(B) The "Injury" Requirement
The terms "injury" and "personal injuries" are defined by the Act as "injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom." La.R.S. 23:1021(7). "These terms shall in no case be construed to include any other form of disease or derangement, however caused or contracted." Id.
The definition of "injury" contains a requirement of "violence to the physical structure of the body," but the statutory definition does not use the terms "physical injury" or "mental injury." Nor does the statutory definition attempt to provide any basis or method for distinguishing between "physical" and "mental" injuries.
Nevertheless, in attempting to determine the types of injuries covered by the Act, Louisiana courts have often drawn distinctions between physical and mental injuries. In Louisiana, as well as in other jurisdictions, worker's compensation cases involving mental injury or trauma have been grouped by courts and commentators into three general categories: (1) cases in which observable physical trauma causes mental injury ("physical-mental" injury cases); (2) cases in which mental stress or stimulus causes observable physical trauma ("mental-physical" injury cases); and (3) cases in which mental stress or stimulus causes so-called "purely mental" injuries, that is, injuries unaccompanied by any observable or apparent physical trauma ("mental-mental" injury cases). See Larson, 1B Workmen's Compensation Law, § 42.20 (1986 & 1988 Supp.). See also Jordan v. Southern Natural Gas Co., 455 So.2d 1217, 1223-26 (La.App. 2nd Cir.1984). While the distinctions between these categories may often be less than precise,[2] the categories provide a helpful basis for reviewing the jurisprudence pertinent to mental injuries and for resolving the issues presented by this case.
In so-called "physical-mental" injury cases, where a mental injury or illness develops secondary to an ascertainable physical injury, Louisiana courts have uniformly found that the employee is entitled to compensation benefits for any disability resulting from the mental injury and to reimbursement for medical expenses incurred in the treatment of that condition. See, e.g., Westley v. Land & Offshore, 523 So.2d 812 (La.1988) (employee suffered post traumatic stress syndrome secondary to physical injury caused by fall); Droddy v. Cliff's Drilling, Inc., 471 So.2d 223 (La.1985) (employee suffered depressive neurosis as "emotional overlay" to physical injury caused by fall). See also Jordan v. Southern Natural Gas. Co., supra, 455 So.2d at 1222 ("[W]hen a plaintiff develops a disabling anxiety syndrome, traumatic neurosis, or other mental disorder as a result of a work related physical injury, he can recover *144 compensation benefits even if he has recovered physically from the injury."). Allowance of coverage in these "physical-mental" injury cases seems clearly appropriate under the Act's definition of "injury," which covers not only the initial injury suffered by the employee but also "such disease or infections as naturally result therefrom."
We have also recognized that coverage is appropriate where mental stress or strain related to employment causes physical trauma ("mental-physical" injury cases). The leading Louisiana case in this area is Ferguson v. HDE, Inc., 270 So.2d 867 (La. 1972), wherein coverage was allowed for an employee who suffered a stroke while arguing with his supervisor. Noting that the claimant unquestionably would have been entitled to compensation if the stroke had been brought on by physical stress, however minimal, we found no basis for denying recovery when the injury was precipitated by mental stress:
Is there a valid distinction between injuries which occur in the course of some physical exertion, however slight, and injuries which occur because of emotional shock, fright or stress? The violence to the physical structure of the body is the same. The sudden and unexpected nature of the occurrence is the same. The catastrophic effect upon the workman is the same. When the events are clearly job-connected, there seems to be no reason to sustain a claim for a heart attack or a stroke caused by some ordinary physical exertion and to reject a claim caused by extraordinary mental or emotional exertion. 270 So.2d at 870.
In the third category are the "mental-mental" injury cases, in which there is no indication of apparent physical trauma but the claimant sustains disability due to mental illness precipitated by work-related mental stress. We have never considered whether such injuries are compensable, and our courts of appeal are divided on the issue.[3] This case, which concerns an injury that was not precipitated by any observable physical trauma, squarely presents that issue.
The Louisiana court of appeal decisions which have denied coverage in this area have done so primarily on the ground that the statutory requirement of an injury "by violence to the physical structure of the body" is not satisfied unless the injury was caused by some blow or physical force which causes observable physical injury. For example, in Sutherland v. Time Saver Stores, Inc. 428 So.2d 972 (La.App. 1st Cir.1983), the employee, a convenience store clerk, suffered mental complications after she was robbed at gunpoint. The robber ordered the plaintiff to disrobe, and as she was doing so the police arrived and arrested the perpetrator. Although plaintiff was not physically assaulted in any way, expert testimony established that she suffered from a disabling anxiety syndrome as a result of the incident. The court of appeal affirmed summary judgment in favor of the employer, holding that the employee was not entitled to compensation because "in order to recover in workmen's compensation for a mental disability there must first exist a physical detriment as a causative or contributory factor." 428 So.2d at 972.
See also Jordan v. Southern Natural Gas Co., 455 So.2d 1217 (La.App. 2nd Cir. 1984) (coverage denied where plaintiff claimed that he suffered a disabling mental condition that was caused by a series of stressful incidents on his job, including a transfer that was an apparent demotion and the requirement of increased travel); Franklin v. Complete Auto Transit Co., 397 So.2d 60 (La.App. 2nd Cir.1981) (coverage denied where employee alleged mental disability arising from narrowly avoiding an automobile collision, after having already been involved in an earlier collision in which the other driver was killed).
On the other hand, Louisiana court of appeal decisions which have permitted recovery for these types of injuries have concluded *145 that when an employee suffers from a mental disability which is serious enough to render that employee unable to work, then the injury has done "violence to the physical structure of the body." For example, in Jones v. City of New Orleans, 514 So.2d 611 (La.App. 4th Cir.1987), writ denied, 515 So.2d 1111 (La.1987), compensation benefits were awarded to an employee who suffered from post traumatic stress syndrome as a result of threats to her safety that were made during the course of her employment. In allowing coverage, the court of appeal stated that "[w]e cannot ignore the scientific fact that mental disorders constitute an injury to the physical capabilities of a worker." 514 So.2d at 814.
Similarly, in Taquino v. Sears, Roebuck & Co., 438 So.2d 625 (La.App. 4th Cir.1983), writ denied, 443 So.2d 597 (La.1983), the employee alleged that he had a nervous breakdown as a result of a number of stressful incidents at work, including a transfer and reduction in pay. The trial court dismissed the claim on an exception of no cause of action, and the court of appeal reversed. The court stated:
Our "accident" definition does not distinguish between organic and psychological injuries. To exclude nervous disorders is to create an artificial barrier between other work-related injuries. How a worker's body reacts to a given situation can result in different types of injuries. What may cause one worker to suffer a heart attack (a compensable injury) may cause another worker to break down emotionally ([arguably] a non-compensable injury). 438 So.2d at 627.
Thus, the essential issue over which our courts of appeal are divided, and which we are called upon to resolve here, is whether the statutory requirement of injury "by violence to the physical structure of the body" is satisfied when the employee suffers a mental disability that is not accompanied by apparent physical trauma or physiological damage. In resolving this issue, we will consider both the requirement of "violence," as interpreted by well-established jurisprudence, and the meaning and scope of the phrase "physical structure of the body."
The statutory requirement of violence is satisfied when the injury has a violent or harmful effect on the employee's physical condition, even if the cause of that change was not in itself violent. Under the jurisprudence, there need not be a blow or visible application of force in order for the "violence" aspect of the statutory definition to be satisfied. See, e.g., Parks v. Insurance Co. of North America, 340 So.2d 276 (La.1976) (inhalation of fumes and lint caused chronic bronchitis, which in turn caused "violence" to the employee's body); Cannella v. Gulf Refining Co., 154 So. 406, 413 (La.App.Orl.1934) (lead poisoning from fumes caused "violence ... to both the blood and the intestines"); Rochell v. Shreveport Grain & Elevator Co., 188 So. 429 (La.App. 2nd Cir.1939) (small particle lodged in employee's eye and caused blindness); Smith v. Brown Paper Mill Co., 152 So. 700 (La.App. 2nd Cir.1934) (infection resulting from hyperdermic injection); Woodward v. Kansas City Bridge Co., 3 So.2d 221 (La.App. 1st Cir.1941) (inflammation of skin by creosote and poison ivy). See also Malone & Johnson, supra § 214.
Thus, there is an "injury" when there is "violence," i.e., a harmful effect, to the "physical structure of the body." One possible interpretation of the phrase "physical structure of the body" is that it refers only to those physical component parts which make up the body, e.g., bones, tissues, organs, etc. We note, however, that the Texas Supreme Court, when interpreting a statutory definition in the Texas worker's compensation act that is similar to our own, rejected this interpretation and held that the "physical structure of the body" refers to:
the entire body, not simply to the skeletal structure or to the circulatory system or to the digestive system. It refers to the whole, to the complex of perfectly integrated and interdependent bones, tissues and organs which function together by means of electrical, chemical and mechanical processes in a living, breathing, *146 functioning individual. To determine what is meant by "physical structure of the body," the structure should be considered that of a living personnot as a static inanimate thing. Bailey v. American General Ins. Co., 154 Tex. 430, 279 SW2d 315, 318 (1955) (emphasis by the court).
In Bailey, the claimant was working on a high-level scaffold with another worker. The scaffold collapsed and plaintiff, who was able to avoid injury to himself because he was caught in a cable, watched his co-employee plunge to his death. Afterward plaintiff claimed inability to work because of a disabling neurosis. The Texas court determined that plaintiff was entitled to benefits because the medical testimony established that as a result of his disabling neurosis, "plaintiff's body no longer functions properly." Id. 279 S.W.2d at 318. The court found itself unable to conclude that "though a `physical structure' no longer functions properly, it has suffered no `harm.'" Bailey, 279 S.W.2d at 318.[4]
We agree with the analysis employed by the Texas Supreme Court in Bailey, while interpreting a statutory definition of injury similar to our own, as well as the reasoning used by the Louisiana Fourth Circuit Court of Appeal in Jones, supra, and Taquino, supra. An individual's mental health is an essential component to the overall operation of the physical structure of his body. If an injury so disables the mental machinery of a worker that "his body no longer functions properly," Bailey, supra, and he is unable to perform his employment duties, then the statutory requirement of violence (harm) to the physical structure of the body is satisfied. This is true regardless of whether the injury was prompted by observable physical trauma and regardless of whether the injury might be characterized as more "mental" in nature than "physical."[5]
While our interpretation of the statutory wording "violence to the physical structure of the body" is admittedly a liberal one, "the courts of this state have consistently accorded the terms of the Workmen's Compensation Act a liberal construction in order to effectuate its beneficent purpose of relieving workmen of the economic burden of work-connected injuries by diffusing the costs in channels of commerce." Parks v. Insurance Co. of North America, 340 So.2d 276, 281 (La.1976). See also Danielson v. Security Van Lines, Inc., 245 La. 450, 158 So.2d 609 (1963); Geist v. Martin, Decker Corp., 313 So.2d 1 (La.App. 1st Cir.1975).
Furthermore, it has been persuasively argued that there is no bright-line distinction between "physical" and "mental" injuries, either in medicine or in law, which provides a reliable basis for awarding or denying workmen's compensation benefits. Many injuries which appear essentially mental in nature may actually be caused or accompanied by physiological change.[6] As Professor Larson has observed:
*147 [T]here is really no valid distinction between physical and "nervous" injury. Certainly medical opinion would support this view, and insist that it is no longer realistic to draw a line between what is "nervous" and what is "physical."... Perhaps, in earlier years, when much less was known about mental and nervous injuries and their relation to "physical" symptoms and behavior, there was an excuse, on grounds of evidentiary difficulties, for ruling out recoveries based on such injuries, both in tort and in workmen's compensation. But the excuse no longer exists. And therefore a state which would withhold the benefits of workmen's compensation from a man who, before an obvious industrial mishap, was a competent, respected iron-worker, and after that mishap was totally incapacitated to do the only job he was trained for, would nowadays be doing unjustifiable violence to the intent of the workmen's compensation act, for reasons that are without support in either legal or medical theory. (emphasis added) Larson, supra, § 42.23(a) at 7-655-56.
Finally, we note that by rejecting the "nineteenth century approach" of making the availability of benefits dependent upon a rigid and absolute distinction between physical and mental injuries, Larson, supra at 7-651 n. 82, we reach a result that has been approved by a majority of the jurisdictions in this country. Id. at 7-639.
We emphasize, however, that a mere showing that a mental injury was related to general conditions of employment, or to incidents occurring over an extended period of time, is not enough to entitle the claimant to compensation. The mental injury must be precipitated by an accident, i.e., an unexpected and unforeseen event that occurs suddenly or violently.[7]
Among the cases involving work-related disabilities which appear to be essentially mental in nature, there are a number of examples of the type of sudden and unusual event which can truly be considered an "accident." See, e.g., Bailey v. American General Ins. Co., supra (plaintiff watched co-employee fall to death after collapse of scaffold); Sutherland v. Time Saver Stores, Inc., supra (robbery and fear of imminent sexual abuse); Davis v. Oilfield Scrap & Equipment Co., 482 So.2d 970 (La.App. 3rd Cir.1986) (co-employee suicide, see discussion in note six, supra). In cases involving such readily identifiable, unusual and dramatic events, compensation is appropriate when there is sufficient evidence that the sudden event caused the disabling mental condition. On the other hand, absent an identifiable accident of this type, an employee's general allegation that he is unable to work due to stress or tension caused by working conditions would not give rise to a compensable claim.
In summary, a mental injury induced by mental stress that is caused by an unexpected and sudden or violent employment-related event may be compensable under *148 the Act. We now consider whether the plaintiff in this case proved by a preponderance of the evidence that she sustained an "injury by accident" that is compensable under the Act.
(C) Application of the Accidental Event and Injury Requirements to This Case; Causation
Defendant argues that there was no "accident" under the Act because "plaintiff never alleged a single, unexpected, unforeseen and catastrophic event which gave rise to her injuries," but rather alleged "a series of events which took place over the course of six and one-half years...." Under the Act, defendant argues, there must be a single, identifiable "event" which produces injury, and separate events which occurred over a six year period cannot constitute an accident.
We find, however, that the communication of the threats to plaintiff on April 6, 1987 was the event which produced injury in this case, not the incidents which occurred in the years prior to the threats. The accident thus occurred on April 6, 1987, and the events prior to that date are relevant simply to the extent that they reinforce the seriousness of the threats and lend credibility to plaintiff's assertion that the threats caused her severe anxiety and distress. See Jones v. City of New Orleans, supra (communication of threats of bodily injury to employee was unforeseen event which constituted accident).
It is evident from the record that plaintiff suffered a temporarily disabling mental injury as a result of learning of the threats that had been made against her. Prior to April 6, 1987, plaintiff had an excellent seven-year work record at the medical center, a record which included a promotion to a supervisory position of substantial responsibility and highly favorable annual evaluations. Prior to April 6, 1987, plaintiff had missed some work due to illness but never for any significant period of time. And prior to April 6, 1987, plaintiff had been able to perform her employment duties in an able and competent manner. Yet after the events on the morning of April 6, 1987, when plaintiff learned of a physical threat to her safety, she experienced an unexpected and sudden inability to perform her normal employment duties. The breakdown or adjustment disorder which she experienced was accompanied by the immediate onset of headaches, tension and loss of appetite. The record evidences that the threats of harm precipitated a change in plaintiff from an able and competent worker to a person who was unable to engage in any meaningful activity, including employment, for almost five months.
All three of the experts called by plaintiff agreed that she was unable to work during the period that they treated her, because of her mental injury, and also because of the related headaches, insomnia and loss of appetite. All three of the experts also expressed the view that the disabling mental condition was caused by the fear and anxiety plaintiff had regarding returning to her job. The defendant presented no medical testimony to the contrary. In fact, the defendant presented no expert testimony at all regarding plaintiff's condition after April 6, 1987.
Defendant also argues that the record casts doubt on whether the threats precipitated plaintiff's injury because the two physicians and the clinical social worker who treated plaintiff did not have notations in their treatment records indicating that plaintiff had told them that she had been threatened. Based on our review of the record, we find this argument unconvincing. Each of the three experts testified that plaintiff plainly conveyed to them that she was very frightened over events that had recently occurred on her job. Dr. Green testified that plaintiff told him she was being harassed because she had reported employees for not doing their jobs. Dr. Roniger testified that plaintiff told him she felt "helpless and afraid" as the result of recent events at her job. And Ms. Jahckne had an independent recollection of plaintiff telling her that she had been threatened at her job. We also note that plaintiff left work soon after she learned of the threats, that she was crying and upset when she called Dr. Green the next day, *149 and that, according to the testimony of a medical center security officer, she "broke down" when attempting to explain to him the events surrounding the threats.
Finally, while there was evidence that plaintiff had some prior medical problems, including sinus headaches in 1985 or 1986 and depression in 1970, there is no indication in the record that whatever problems she experienced prior to April 6, 1987 were related to the disability which she suffered after that date.[8]
In summary, since three experts affirmatively testified that plaintiff's disability was related to her employment, since defendant produced no testimony to the contrary, and since whatever previous medical problems plaintiff experienced were clearly not of the same severity and scope as those brought on by the events of April 6, 1987, we find that plaintiff established by a preponderance of the evidence that her injury was precipitated by the threats to her safety.

Decree
For the foregoing reasons, we agree with the court of appeal that this plaintiff suffered a compensable "injury by accident" under the Louisiana Worker's Compensation Act. Therefore, we affirm the court of appeal's judgment ordering defendant to pay plaintiff $7,303.24 in benefits and medical expenses, plus legal interest and court costs.
AFFIRMED.
MARCUS, J., and HALL, J., pro tem., dissent and assign reasons.
COLE, J., dissents for reasons assigned by HALL, J., pro tem.
MARCUS, Justice (dissenting).
I do not consider that threats to plaintiff over a period of time constitute an "accident" defined as "an unexpected or unforeseen event happening suddenly or violently, with or without human fault, and producing at the time objective symptoms of an injury." Nor do I consider plaintiff's work-related stress to be an "injury" or "personal injuries" defined to "include only injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom. These terms shall in no case be construed to include any other form of disease or derangement, however caused or contracted." Accordingly, I respectfully dissent.
HALL, Justice Pro Temp., (dissenting).
I respectfully dissent.
Whether right or wrong as a matter of social policy, the Louisiana worker's compensation statute does not allow benefits for so-called "mental-mental" injury. The statute specifically excludes any form of disease or derangement other than that naturally resulting from injuries by violence to the physical structure of the body. LSA-R.S. 23:1021(7). Any change should come from the legislature and not the court.
Even under the new interpretation of the law enunciated in the majority opinion, I would hold that this plaintiff is not entitled to benefits because her mental condition, as real and as unfortunate as it is, was not precipitated by an accident, i.e., an unexpected and unforeseen event that occurred suddenly or violently. It was the result of several years of work-related stress.
NOTES
[*] Judge PIKE HALL, Jr., justice pro tempore, participated in this case in place of HARRY T. LEMMON, Justice.
[1] The treatise authors have summarized Louisiana jurisprudence on this issue as follows:

So long as a definite event can in some way be carved out of the general working experience of the employer, and this event can be pointed to with some assurance as the connecting link between employment and injury, the courts have been satisfied to classify such an event as an accident.
. . . . .
The net result of years of interpretive jurisprudence seems to be that if the "result" of an event or series of events is "accidental" (and certainly almost any injury or change in the physical structure of the body would classify as "accidental"), the requirements of this section of the Act are satisfiedwithout regard to whether the "cause" was accidental.
Malone & Johnson, supra, § 214 at 431, 435.
[2] "It must be understood that this use of such words as mental, nervous, emotional, stress, stimulus, psychic, and the like is only a rough expedient adopted in order to sort out an almost infinite variety of subtle conditions and relationships for compensation law purposes, and especially in order to narrow down the range of situations where controversy seems to persist." Larson, IB Workmen's Compensation, supra, § 42.20 at 7-586.
[3] Courts throughout the country are also divided on this issue. While the majority of jurisdictions permit recovery in "mental-mental" injury cases, a substantial minority do not. See Larson, supra § 42.23. On the other hand, almost all jurisdictions permit recovery in "physical-mental" injury and "mental-physical" injury cases. Id. §§ 42.21-22.
[4] The Texas statute defined injury as "damage or harm" to the physical structure of the body, whereas the Louisiana statute refers to "violence to the physical structure of the body." Referring to this difference between the wording of the two statutes, the Texas court commented that the Louisiana definition seemed "more restrictive on its face than that contained in the Texas Act." 279 S.W.2d at 320. However, as noted herein in our earlier discussion of the "violence" requirement, Louisiana courts have long interpreted "violence to the physical structure of the body" to mean damage or harm to the physical structure of the body. Given this historical interpretation of the term "violence" by Louisiana jurisprudence, the difference in wording between the Texas and Louisiana statutes is, as a practical matter, of no consequence.
[5] The definition of "accident" in La.R.S. 23:1021(1) also requires that the unexpected and sudden or violent event must produce "at the time objective symptoms of injury." The requirement of "objective symptoms" has not been construed in the strict medical sense, for such a construction would exclude from coverage many injuries, such as strains, which cannot be verified by objective symptoms. See Rochell v. Shreveport Grain & Elevator Co., 188 So. 429, 431 (La.App. 2nd Cir.1939). All that is required is a showing that the accidental event produces some symptoms of a discernible injury at a point in time sufficient to permit the conclusion that the injury was causally related to employment. See Malone & Johnson, supra, § 216.
[6] That the distinction between physical and mental injury is often obscure is demonstrated by two recent worker's compensation cases, Davis v. Oilfield Scrap & Equipment Co., 482 So.2d 970 (La.App. 3rd Cir.1986) and Guillot v. Sentry Insurance Co., 472 So.2d 197 (La.App. 5th Cir.1985). Seemingly, the facts of Davis present a classic "mental-mental" injury case. The plaintiff suffered a mental disability after her supervisor shot himself at work and died in her arms. While plaintiff suffered from no apparent physical injury or trauma, medical evidence established that plaintiff's mental disability was accompanied by a physiological change in her body that could be measured by electroencephalograms (EEG) and chemical analysis. Because of this evidence, the court of appeal was satisfied that an "injury" had been proven, and allowed compensation. In Guillot, supra, the claimant alleged that he suffered a nervous breakdown as the result of job related stress. There was no evidence of injury by physical trauma, but medical testimony established that the "breakdown" was accompanied by "physiological changes in brain cells along with biochemical changes that could be measured chemically," and recovery of benefits was allowed.
[7] While the sudden onset of physical injury may qualify as the compensable "accident" in some cases, see Ferguson v. HDE, Inc., supra, (stroke), an employee's subjective assertion that he had a sudden onset of symptoms of mental injury, such as depression or anxiety, is not alone sufficient to show that an accident occurred. The employee must be able to point to a discernible employment-related event which caused the mental injury, an event separate and apart from the onset of the symptoms of that mental injury.
[8] Defendant asserts in brief that: "Dr. Green testified that he first examined the plaintiff on March 3, 1986, over a year before plaintiff's last day of work. At that time plaintiff complained of depression and headaches." Actually, we find no reference in Dr. Green's testimony of plaintiff ever having complained to him of depression prior to April 7, 1987. Referring to the March 3, 1986 office visit cited in defendant's brief, Dr. Green testified only that "Miss Sparks was presenting [sic] with a medical complaint of a lump in the right breast." R., Vol. II at 218. Dr. Green's testimony also makes clear his belief that the headaches and related complaints plaintiff had on and after April 7, 1987 were different in origin and nature from any condition for which he had treated her in the past.