606 So.2d 1307 (1992)
Roosevelt PROYER, Jr.
v.
MONSANTO COMPANY.
No. 92-CA-233.
Court of Appeal of Louisiana, Fifth Circuit.
September 28, 1992.
Eric J. Halverson, Jr., Metairie, for plaintiff/appellee, Roosevelt Proyer, Jr.
Clare Jupiter, Bryan, Jupiter, Lewis & Blanson, New Orleans, for defendant/appellant, Monsanto Co.
Before KLIEBERT, BOWES and GAUDIN, JJ.
BOWES, Judge.
Monsanto Company, defendant/appellant, appeals from a judgment of the district court in favor of plaintiff, Roosevelt Proyer, Jr., finding him permanently and totally disabled and therefore entitled to worker's compensation benefits. We affirm.

PROCEDURAL HISTORY
Roosevelt Proyer, Jr. (hereinafter "Proyer"), filed suit in the Twenty-Fourth Judicial District Court for Worker's Compensation benefits, penalties and attorney fees for failure to pay the applicable statutory benefits. Following trial on the merits, the district court found that Proyer was totally and permanently disabled and thus entitled to the payment of compensation benefits in the amount of $267.00 per week, from the date of his termination, to be offset by plaintiff's social security benefits as stipulated by the parties. Monsanto was further ordered to pay all medical expenses of Proyer "reasonably and necessarily" related to his injury. The court denied penalties and attorney fees. Monsanto appeals the finding of liability for compensation benefits. Proyer has not appealed.

FACTS
Proyer was an employee of Monsanto for thirteen years preceding his termination. *1308 His position at that time was as a senior production technician. This job required that he operate a control board through which the process of mixing and manufacturing chemicals was handled. Inherent to this process are certain dangers, such as "fusion," a form of spontaneous combustion, which has serious potential consequences to the employees, the plant, and the neighboring community. It is apparent from the evidence that fusions can occur for several reasons which do not involve employee or operator fault.
Proyer testified that his job was stressful, particularly in the last months of his employment. The primary reason for this seems to be that during the last year prior to Proyer's termination, Monsanto changed its equipment from a manual operating board to a computerized operating board. Proyer's immediate supervisor was Russell Markey, who in turn reported to George McGowan, the general manufacturing supervisor. George McGowan testified that a new piece of equipment called a compactor was part of the problem causing an increase in the number of fusions, along with the frequency of rotating jobs and expanding the work force at the operator level.
Proyer was under increased pressure associated with learning to operate the new equipment, and several fusions occurred on his shift over a period of a few months. Plaintiff had previously been reprimanded from time to time over the period of his employment for safety violationson one occasion in 1984, he disconnected a chlorine hose without wearing a respirator, and later that year he was cited for hooking up a car containing sulfuric acid without protective equipment. In May of 1988, McGowan had a discussion with plaintiff about the frequency of the fusions which occurred on his shift, following up the conference with a memo in which McGowan stated "Roosevelt has become `King of Fusions'... I indicated to Roosevelt that safety and NO FUSIONS are his top priority. He understands that it is fine to make lower rates and divert to rework to AVOID fusions." On the other hand, contradicting this, the company (through Russell Markey) put up nightly report sheets which stated "Don't make rework" or "minimize making rework." ("Rework" is apparently a term which covers having to do the chemical process over again.)
In June of 1988, Proyer was sent a letter from Russell Hoch, the general manufacturing superintendent, informing him that his job was "on the line." The letter reviewed Proyer's recent history, including counseling sessions between Proyer and McGowan relative to the fusions and the resultant warnings and general instructions given by McGowan. The letter restated that Proyer was known as "King of Fusions" and that he had lost credibility with his co-workers. Proyer was given two days off, with pay, to think about his past performance and to formulate an improvement plan in writing. Plaintiff was given the chance to resign at that point or to "accept this assignment and perform as a model technician. Failure to satisfactorily complete this assignment or any future performance problem will mean your termination." Proyer stated that he wrote the required improvement plan and continued to work although he felt under constant threat of losing his job. He testified that he was doing everything he could to stop the fusions, but felt under pressure to improve his record. As his problems at work continued, he began to drink wine at home after work, to help induce sleep as he was having problems trying to sleep well. He was never intoxicated at work and in fact his superiors were surprised to learn (immediately before firing him) that he had never drank alcohol. Proyer and his wife both testified that he did not get drunk (although he was later diagnosed as having a history of alcohol abuse).
On February 16, 1989, a fusion occurred at Monsanto. Plaintiff had operated the board the evening before the fusion took place, but was at home when the incident occurred. Proyer testified that he had warned the relief technician to watch closely, *1309 that he (Proyer) had been fighting a fusion all night and it appeared to him that one might take place. Proyer had shut down the equipment on his shift to permit the system to cool off. While at home, he received a telephone call from a co-worker telling him that "they" (Monsanto) were trying to blame plaintiff for the fusion.
It is relevant to note at this juncture that George McGowan testified that he had, in the past, telephoned Proyer at home presumably for business purposes, and McGowan agreed that Proyer may have been called by someone from Monsanto relative to an investigation of the fusion. Therefore, this telephone call falls into the category of the course and scope of Proyer's employment.
Proyer testified that it was at this time when he began to formulate plans to kill his employers, McGowan, and other supervisors. "Well, it was more like suicide-homicide. I was going to kill these guys and then wait until the police come and let the police take my life."
Plaintiff continued to go to work and "visualize" his plan. He asked a co-worker about obtaining a gun. On February 21, another fusion occurred. Proyer was not at the control board, but was the "outside man" monitoring the equipment. According to the written report required by Monsanto, plaintiff reached in a chemical mixer and grabbed the hot product in an effort to contain the fusion "... and also jog the mixer because it had tripped." Plaintiff then placed a hose in the mixer. He was wearing gloves throughout the procedure, but was called to task and criticized by McGowan for not locking the equipment before putting his hand into the mixer, which is a violation of Monsanto's safety regulations. Pursuant to the problem, he was sent home on March 1, with pay, until his supervisors reached a decision relative to his future employment. Upon being sent home, Proyer had a severe breakdown, or "psychotic episode," becoming delusional, suicidal and homicidal believing that his supervisors were unfairly trying to fire him.
On March 3, Mrs. Proyer took plaintiff to DePaul Hospital, which transferred him to Ochsner because of plaintiff's insurance coverage, where he was admitted on an emergency basis. The admitting diagnosis was acute psychotic paranoid disorder.
While Proyer was an in-patient at Ochsner he received a pass and on March 29 went to Monsanto. At that point he was terminated. McGowan testified that he was aware at that time that plaintiff had been a patient at Ochsner, although he did not recall if he knew Proyer was still an inpatient on the day he was fired.

APPEAL
Following trial, the court, in its reasons for judgment, stated as follows:
The Court finds Sparks, infra, controlling in this case. The doctors testified that plaintiff had suffered a mental injury brought on by mental stress. The February 16th event combined with the March 1st event constitute the "unexpected and sudden or violent employment-related event that caused plaintiff's injury. Plaintiff is permanently and totally disabled.
On appeal, Monsanto argues that (1) it was error to find that plaintiff proved an accident and disabling injury under the Worker's Compensation Act; (2) that it was error to find causation between any mental disability and any significant employment related event; (3) that the court erred in failing to find that plaintiff's disability developed gradually; (4) in failing to give proper weight to the testimony of plaintiff's treating physician; and (5) that the court erroneously limited Monsanto's proof to justification of its disciplinary actions toward plaintiff.

ANALYSIS
In Sparks v. Tulane Med. Ctr. Hosp. & Clinic, 546 So.2d 138 (La.1989), our Supreme Court adopted the rule that a mental injury induced by mental stress is compensable *1310 in worker's compensation cases even when unaccompanied by apparent signs of physical trauma, when there is a sudden or violent employment related event. There the court found that:
... there is an `injury' when there is `violence,' i.e., a harmful effect, to the `physical structure of the body.'
In elaborating on the concept of "violence" and "injury" in cases of mental disorders, the court continued as follows:
The statutory requirement of violence is satisfied when the injury has a violent or harmful effect on the employee's physical condition, even if the cause of that change was not in itself violent. Under the jurisprudence, there need not be a blow or visible application of force in order for the `violence' aspect of the statutory definition to be satisfied.
* * * * * *
An individual's mental health is an essential component to the overall operation of the physical structure of his body. If an injury so disables the mental machinery of a worker that `his body no longer functions properly,' Bailey, supra, and he is unable to perform his employment duties, then the statutory requirement of violence (harm) to the physical structure of the body is satisfied. This is true regardless of whether the injury was prompted by observable physical trauma and regardless of whether the injury might be characterized as more `mental' in nature than `physical.'
[Emphasis supplied].
Monsanto points out that portion of Sparks which states as follows:
We emphasize, however, that a mere showing that a mental injury was related to general conditions of employment, or to incidents occurring over an extended period of time, is not enough to entitle the claimant to compensation. The mental injury must be precipitated by an accident, i.e., an unexpected and unforeseen event that occurs suddenly or violently.
Monsanto avers that both incidents which the trial court found to constitute "accidents" were long foreseen by the plaintiff and neither occurred suddenly or violently. As defendant urged, plaintiff had received a number of warnings about his performance prior to dismissal. Monsanto claims that any change in the plaintiff's ability to work occurred gradually and that he sought psychiatric care "not because of any inability to function on or off the job, but because he came to fear his homicidal and suicidal ideas."
We find that under the facts and circumstances of this case, the trial judge committed no manifest error in his finding that the enumerated incidents of February 16 and March 1 constitute "accidents" or the "unexpected and sudden or violent employment related events" that caused plaintiff's mental injury induced by stress within the meaning of the worker's compensation law; and although we, or some of us, may have construed the facts differently, we cannot say that the interpretation of the facts and the expert medical testimony by the trial judge, who saw and heard the witnesses, was clearly wrong.
At this juncture, it is appropriate to consider defendant's assignment of error regarding the expert physician witnesses.
Dr. Andrew Mebane testified for the defendant via deposition. Dr. Mebane is a psychiatrist at Ochsner and is the Director of the Substance Abuse Program. According to his deposition (the Ochsner medical records were not part of the record, although Dr. Mebane had them available throughout his testimony), Mr. Proyer was seen in the emergency room by Dr. Smith-Blair, a resident. Dr. Smith-Blair consulted with a Dr. Rochelle, and the two admitted Proyer to the acute psychotic unit. The "working diagnosis" on admission was "acute psychosis disorder, paranoid disorder, question mark, increased alcohol use." Before Dr. Mebane saw Proyer he was also interviewed by a Dr. Billings and a Dr. Bowers-Stephens in the psychiatric units. *1311 Dr. Mebane stated that plaintiff was admitted to the Substance Abuse Clinic on March 6. While Dr. Mebane then technically became the attending physician, he testified that his actual contact with Proyer was secondary, and that Dr. Smith-Blair worked with the patient and his family. As Dr. Mebane testified "... much of my information is from the chart and from Dr. Smith-Blair." Although he saw Proyer on three or four occasions, Dr. Mebane had not seen him since his admission (to the Substance Abuse Unit on March 6, 1989).
Dr. Oliver Sanders, also a psychiatrist, testified on behalf of the plaintiff. Dr. Sanders interviewed Proyer three times and reviewed his medical records, as well as his employment record. The initial evaluation took place six months after plaintiff's admission to Ochsner and took two days to complete. The final evaluation was held one month before trial.
Under these circumstances, we do not find that Dr. Mebane was in a superior position to evaluate the plaintiff than was Dr. Sanders. Both had actual contact with the plaintiff on the same number of occasions and both had access to his medical records. While Dr. Mebane had the opportunity to interview the plaintiff at a point closer to his "breakdown," it is apparent that in the hierarchy of the medical clinic, Dr. Mebane (of necessity) made a diagnosis and formed an opinion chiefly from impressions obtained firsthand from the physicians whom he supervised, and partially from his own observations.
Dr. Sanders also had first and secondhand (the reports) information upon which he could base his opinion.
In considering the trial judge's decision to rely upon the opinion of Dr. Sanders, we are guided by the Supreme Court decision of Williams v. Regional Transit Authority, 546 So.2d 150 (La.1989), wherein the court said:
It is well established that the trial judge has considerable discretion in accepting or rejecting expert testimony, and that the trial judge's decision to accept the testimony of one expert over another should not be disturbed absent manifest error.
Accordingly, after reviewing the entire record, we find no manifest error in the determination by the trial court to accept the diagnosis made by Dr. Sanders.
Dr. Sanders opined that the plaintiff suffered from depression, alcohol abuse, a borderline personality disorder, and paranoia. According to Dr. Sanders, Proyer is a fragile person who, under little stress, would function very well, but would react poorly under great stress. Alcohol aggravated the situation, but was not, in his opinion, the primary problem. Proyer had been under a lot of stress on his job, but was coping until the last few days when "he really broke down." There were two episodes which were probably the "discreet events" culminating in Proyer's psychotic break according to Dr. Sanders: When Proyer was accused of causing the fusion of February 15, which occurred while he was at home; and when he was sent home from work after the February 21 fusion.
There is considerable evidence to support this position (taken by Dr. Sanders), Proyer himself testified that he began to formulate his homicide/suicide plan on the night that a Monsanto co-worker called him at home. He stated that when that one of the incidents toward the end took place, he knew he would be terminated no matter what else happened. However, he was able to keep his plans to himself at that time. On the day he was sent home after the second fusion, he stated that he cleaned his gun. Also, he stopped drinking. He called McGowan to ask if he was ready to see plaintiff and he became preoccupied with his plans for murder.
Mrs. Proyer testified that for about one month before being sent home, her husband began to change. On the day he received the phone call from Monsanto he became very upset and angry. On the day he was sent home his behavior changed *1312 drastically, and he began to speak openly about his murder plans. At that point she stated that she felt she had no choice but to bring him to the hospital. Proyer himself then asked to be taken, because he had become obsessed with the idea of murder.
The evidence shows that up until March 1, the date he was sent home, Proyer was functioning at work and at home, although his behavior at home was beginning to deteriorate. There is no evidence that Proyer was unable to perform his job until Monsanto released him with pay. Two days later he was admitted to Ochsner.
Dr. Sanders stated the two events heretofore described "pushed him over the edge" and caused his brief psychosis. Proyer's mental problems had begun long before either episode but as the doctor stated:
... what caused [the complete breakdown] was the worry about what was going to happen to him, the loss of his career because of the way he was handling his job, whatever his supervisors were doing that was causing the stress for him right there at the end is what I think broke him down.
The last day of his employment when he was sent home was "the straw that broke the camel's back." Dr. Sanders found that since that breakdown, which led to his hospitalization, plaintiff has been unable to function at any type of work. Dr. Sanders stated that Proyer could not return to work and "it would require a great deal of work for him to become functional again." He "may be able to [return to work] some day in the future if he recuperates enough."
Furthermore, we do not find that the depositions of Dr. Mebane directly contradict the holding of the trial court that the work incidents caused plaintiff's injury. While Dr. Mebane felt that plaintiff's chief problem at the time of admission was alcoholic hallucinosis, he agreed that Proyer was definitely under job stress. When asked if being sent home from work was a significant event which increased his stress Dr. Mebane replied:
Sure. That was his presenting complaint. It's certainly important. It's an important event that happened to him. It was on his mind.
Q. It's not just alcohol making this happen, is it?
A. No; absolutely not.
In the medical report as read by Dr. Mebane, a note from Dr. Smith-Blair reads: "Alcohol withdrawal appears to be mild. Explained biggest problem is stress at work." (Emphasis supplied).
In his second deposition Dr. Mebane stated as follows:
I believe that alcohol and personality variables combined with stresses on the job were probablyit's hard to say, equally important. You know, you would like me to pull one as more important, the reprimand or his continued high intake of alcohol, it's all sort of together as I see it. It's very hard for me to, at this stage of the game and then recalling the admission, say that one is more important than the other. They are all so gelled.
[Emphasis supplied].
In Rosell v. ESCO, 549 So.2d 840 (La. 1989), the Supreme Court stated as follows:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,' and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have *1313 weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. In applying the manifestly erroneousclearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.

When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
At pp. 844-845. [Cites and Footnotes omitted].
In Taquino v. Sears, Roebuck and Co., 438 So.2d 625 (La.App. 4 Cir.1983), writ denied, 443 So.2d 597 (La.1983), cited with approval in Sparks, supra, permitted recovery of compensation benefits to a claimant whose nervous breakdown was the alleged result of continued transfers, reduction in pay, and an "inordinate amount of pressure" from his superiors. In Williams v. Regional Transit Authority, supra, the court found that post-traumatic stress disorder following an (alleged improper) arrest was compensable. The court said that the arrest constituted an accident within the meaning of the compensation laws.
In Frederick v. Town of Arnaudville, 572 So.2d 316 (La.App. 3 Cir.1990), plaintiff was awarded compensation benefits after he suffered a disabling mental injury following an altercation with his superior. The Third Circuit affirmed, stating:
The law is clear that an employer takes the worker as he finds him. An abnormally susceptible worker is entitled to no less protection under the compensation statute than a healthy worker. Guillory v. United States Fidelity and Guaranty Insurance Company, 420 So.2d 119 (La. 1982).
Frederick has demonstrated his disability results from his altercation with the police chief. Perhaps this incident, taken by itself, would not meet the Sparks requirement of a `significant employment incident.' But when considered with Frederick's preexisting, work related, mental condition, which was asymptomatic immediately prior to this incident, we cannot say the trial court erred in finding the plaintiff proved a work related accident.
We agree with the reasoning in the above cases. Proyer has demonstrated, and the trial court so found, that his mental condition was stable, if not healthy, prior to the incidents in question; and immediately following the incidents, plaintiff suffered a psychotic break and finally a breakdown. He was abnormally susceptible to the job pressure, and the telephone call combined with being sent home was, indeed, the straw that broke the camel's back and precipitated his disorder.
Monsanto alleges that the trial court should have allowed evidence that its warnings and reprimands to Proyer were justified. However, the entire written employment record of the plaintiff was admitted into evidence, allowing the trial court to make a determination in that regard. Moreover, the analogy which Monsanto attempts to draw from this case to Williams, supra, is not well taken. In Williams, the employee was arrested and accused of a crime, and his guilt or innocence was an *1314 issue in determining the question of whether the "injury" arose out of his employment. Here, as the trial judge ruled (with which we do NOT disagree) the testimony and evidence show that the injuries suffered by Proyer clearly arose out of his employment.
After a review of all the evidence presented in the record, as well as of the applicable jurisprudence above, we cannot say that the learned trial judge was manifestly erroneous in his finding that the incidents outlined above constitute the accident which caused plaintiff's injury.

DECREE
For the foregoing reasons, the judgment of the district court finding Roosevelt Proyer totally and permanently disabled under worker's compensation is affirmed in all respects. Costs of this appeal are taxed to appellant.
AFFIRMED.