United States Court of Appeals,

Fifth Circuit.

Nos. 92-4795, 92-4995, 92-5069, 92-5294 and 93-5226.

Frank S. DEUS, Plaintiff-Appellant,

v.

ALLSTATE INSURANCE CO., Defendant-Appellee,

Voorhies & Labbé, Intervenor-Appellant.

Frank S. DEUS, Plaintiff,

v.

ALLSTATE INSURANCE COMPANY, Defendant-Appellee,

v.

NATIONAL NEIGHBORHOOD OFFICE AGENTS' CLUB, INC., and Randy J. Lane, Movants-Appellants.

Frank S. DEUS, Plaintiff-Appellant,

v.

ALLSTATE INSURANCE CO., Defendant-Appellee.

Frank S. DEUS, Plaintiff-Appellant, Cross-Appellee,

v.

ALLSTATE INSURANCE CO., Defendant,

v.

VOORHIES & LABBÉ, Intervenor-Appellee Cross-Appellant.

Frank S. DEUS, Plaintiff-Appellant,

v.

ALLSTATE INSURANCE CO., Defendant-Appellee.

March 8, 1994.

Appeals from the United States District Court for the Western District of Louisiana.

Before HENDERSON,[*] SMITH, and EMILIO M. GARZA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

I.

Plaintiff, Frank Deus, was an agent for defendant Allstate Insurance Co. ("Allstate") in its Jackson, Mississippi, region from 1968 until August 1987, when he suffered a mental breakdown rendering him unable to work. He now suffers from severe tinnitus (ringing in the ears) and depression. He claims that Allstate intentionally inflicted severe emotional distress upon him, causing his breakdown. During the time at issue in the suit, Deus worked under the following managers: Dave Blankenhorn, Regional V.P.; Ken Artiques, Human Resources; Dusty Rhodes, Territorial Sales Manager ("TSM"); and Scott Raley, Market Sales Manager ("MSM").

Throughout his nineteen years with Allstate, Deus was a "company office agent," or "COA." His status as a COA was established through an employment agreement with Allstate, obligating Allstate to provide support for Deus and his office. Deus's agreement stated that Allstate could not terminate him for unsatisfactory work unless it first gave him notice, pursuant to a specific multi-phase procedure to determine that his work was unsatisfactory and that his job was in jeopardy. After giving notice, Allstate was required to provide Deus a "reasonable opportunity to bring his performance up to satisfactory standards" and could not fire him for unsatisfactory work if he responded favorably.

In early 1985, Allstate began the Neighborhood Office Agent ("NOA") program in the Jackson region. The NOA program was designed to place agents in customers' neighborhoods by establishing smaller offices in multiple locations around town. The NOA program was part of an overall plan called Foundation for Growth, designed to increase Allstate's business.

Under the old system, Allstate directly paid office expenses, while under the NOA system, Allstate provided money directly to the NOA (based upon the agent's production) to spend in operating an office. An agent also could spend additional money to enlarge his office or staff. Existing agents entering the NOA program could either retain their old contract and compensation

[*]Circuit Judge of the Eleventh Circuit, sitting by designation.

schedule or convert to a new contract basing compensation upon new business production. After Allstate began the NOA program, all new agents were hired into that program.

Allstate realized that the NOA program would disrupt existing company offices and the agents who stayed in them, but it believed that the NOA system was the best way to facilitate growth and market reach for the company. Managers in the Jackson region notified their agents of the expected detrimental impact on the existing agents of the transition to the NOA system. Agents were made aware that the marketing advantages of the NOA system would result in stiffened competition.

As agents left the company offices, the most desirable NOA locations would be taken by those agents who first elected to enter the NOA program. The agents were warned that as agents left company offices to go into NOA offices, it could become necessary to close and/or consolidate those offices or move the remaining agents to more productive locations. Further, as the number of agents in a particular office decreased, secretarial help and other administrative support probably would be cut back accordingly.

These statements were made as factual representations of what the company expected to see as a consequence of the development of the NOA program. Although some agents personally perceived these warnings as threats, there was no probative testimony to support the claim that it was Allstate's goal to pressure existing agents to convert to the new program.

Groups of similarly-situated agents, called peer groups, formed the basis for the agent ranking, performance evaluation, and disciplinary procedures. As the NOA agents became established, the peer groups were changed to avoid comparisons among agents with disparate marketing advantages and production possibilities. Rate changes in rural areas also necessitated protecting those agents from comparisons with agents operating in a more competitive market. There was no probative testimony supporting Deus's contention that his peer group was altered for the purpose of inflicting emotional distress on him.

Some veteran agents, such as Deus, were apprehensive about joining the NOA program, which could be more risky because of the need for more aggressive selling and its emphasis on new business. The advertising and other marketing advantages offered to agents entering the NOA

program also caused apprehension for the remaining COA's. There is no evidence, however, that Allstate's actions were anything other than efforts to encourage participation in the NOA program and to exemplify its emphasis on developing new business.

In 1984, Allstate fired twenty percent of the managers in Deus's office and brought in a number of new people. There is evidence that these changes increased tension for everyone in that office. But there is no indication that Deus was the only agent affected or that the changes were made with the intent of causing anyone emotional distress.

During the 1985-87 time period, Allstate's disciplinary process in the Jackson region involved three steps: the unsatisfactory business analysis review, the corrective review (a ninety-day period during which an agent had to meet the sales averages of his peer group), and the job-in-jeopardy (a second ninety-day period during which an agent again had to meet specific sales goals), the last of which could lead to termination. The job-in-jeopardy could not be administered without the written approval of the Jackson managers as well as an agent's territorial and district sales managers. At each step, if the goals were met, the disciplinary process would cease.

Deus was placed on corrective review in 1985 and 1987. At the end of his second corrective review term, he had not met his goals. He claims that his failure resulted from Allstate's manipulating the deadline for submitting new accounts.

Nonetheless, Deus was taken off formal corrective review. Scott Raley placed Deus on an unofficial, verbal, local review program that could not result in Deus's termination. Following this discussion with Raley, Deus left work and never returned.

During the period of time that Deus identifies as creating mounting stress, his pre-existing tinnitus altered in character and intensified. He admitted to making errors and mistakes at work and having short-term memory problems to the point that he feared he was getting Alzheimer's disease in the spring of 1986. He consulted a doctor but never informed any of his supervisors of his worsening condition, and he testified that he had no idea how his supervisors could have discovered it.

II.

In 1988, Deus filed suit against Allstate in both federal and state court, alleging intentional infliction of emotional distress, abuse of rights, defamation, breach of contract, negligent infliction of emotional distress, and worker's compensation. He proceeded with his federal court case, withholding his state case until the eve of trial.

The district court granted summary judgment to Allstate on Deus's claims for worker's compensation, abuse of rights, negligent infliction of emotional distress, and negligent misrepresentation. Of these claims, Deus has appealed only from the denial of worker's compensation and abuse-of-rights claims.

At the close of Deus's case, Allstate moved for judgment as a matter of law pursuant to FED.R.CIV.P. 50(a) on Deus's remaining claims for breach of employment contract and intentional infliction of emotional distress. At the close of its defense, Allstate reurged its motion. The court granted the motion as to the contract claim but kept the motion under advisement as to the claim for intentional infliction of emotional distress.

The remaining claim went to the jury, which decided for Deus. Allstate contends that the jury verdict was never made the judgment of the court. The court issued a ruling denying the pending rule 50 motion on the merits of the intentional infliction of emotional distress claim, but it kept Allstate's prescription defense to that motion under advisement and requested briefing. Then, the district court reconsidered, *sua sponte,* its earlier ruling denying Allstate's rule 50(a) motion as to the merits of Deus's claim for intentional infliction of emotional distress and, on July 10, 1992, granted Allstate's motion and rendered judgment in favor of Allstate, dismissing Deus's suit. 800 F.Supp. 420.

On July 28, 1992, Deus filed an appeal from all judgments dismissing his claims for worker's compensation, abuse of rights, breach of contract, and intentional infliction of emotional distress. On August 10, 1992, Allstate filed in district court a motion for a preliminary and permanent injunction, seeking to enjoin further litigation of the state action. The court granted this motion, which action Deus also appeals.

There were also motions for intervention filed by the National Neighborhood Office Agents' Club ("NNOAC") and Randy J. Lane and by Deus's original attorneys, Voorhies and Labbé. The

former was denied, the latter granted.

## III.

### A.

This court reviews a grant of summary judgment *de novo. Hanks v. Transcontinental Gas Pipe Line Corp.,* 953 F.2d 996, 997 (5th Cir.1992). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). The party seeking summary judgment carries the burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). After a proper motion for summary judgment is made, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Hanks,* 953 F.2d at 997.

We begin our determination by consulting the applicable substantive law to determine what facts and issues are material. *King v. Chide,* 974 F.2d 653, 655-56 (5th Cir.1992). We then review the evidence relating to those issues, viewing the facts and inferences in the light most favorable to the non-movant. *Id.* If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented. *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2554.

The district court's grant of judgment as a matter of law on Deus's tort and contract claims is reviewed *de novo. Charles E. Beard, Inc. v. McDonnell Douglas Corp.,* 939 F.2d 280, 282 (5th Cir.1991). Judgment as a matter of law is proper only if, under the governing law, there can be but one reasonable conclusion as to the verdict. As in the case of a motion for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Furthermore, the inferences are to be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

B.

Deus contends that the court erred in granting Allstate's rule 50(a) motion on his claim for intentional infliction of emotional distress. Finding no error, we affirm.

1.

There are three elements to a claim for intentional infliction of emotional distress under Louisiana law: (1) that Allstate's conduct was so extreme in degree and so outrageous in character that it went beyond all bounds of decency and was utterly intolerable in a civilized community; (2) that such conduct caused severe emotional distress; and (3) that Allstate intended, by performing the acts complained of, to inflict severe emotional distress on Deus, or that Allstate knew that such severe emotional distress would be certain or "substantially certain" to result from the conduct. *White v. Monsanto Co.,* 585 So.2d 1205, 1209 (La.1991). The test established by *White* was derived from the RESTATEMENT (SECOND) OF TORTS (the "RESTATEMENT") § 46. *White,* 585 So.2d at 1209 ("[w]e affirm the viability in Louisiana of a cause of action for intentional infliction of emotional distress, generally in accord with the legal precepts set for in the Restatement text and comments.").

The conduct complained of "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* "Liability," however, "does not extend to mere insults, indignities, threats, annoyance, petty oppressions, or other trivialities." *Id.* "The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." RESTATEMENT § 46, comment d.

2.

This court has followed the RESTATEMENT in applying Texas's law of intentional infliction of emotional distress. *See Wilson v. Monarch Paper Co.,* 939 F.2d 1138, 1143 (5th Cir.1991); *Dean v. Ford Motor Credit Co.,* 885 F.2d 300, 306 (5th Cir.1989). Because Louisiana has derived its law on this tort from the RESTATEMENT, the RESTATEMENT provides a guide to the likely decision of the Louisiana courts if confronted with the issue.

What actions are extreme and outrageous will differ according to context. "[D]isciplinary action and conflict in a pressure-packed workplace environment, although calculated to cause some degree of mental anguish, is not ordinarily actionable." *White,* 585 So.2d at 1210. In *Wilson,* the court noted that to manage its business properly,

> every employer must on occasion review, criticize, demote, transfer, and discipline employees. We also acknowledge that it is not unusual for an employer, instead of directly discharging an employee, to create unpleasant and onerous work conditions designed to force an employee to quit, i.e., "constructively" to discharge the employee. In short, although this sort of conduct often rises to the level of illegality, except in the *most* unusual cases it is not the sort of conduct, as deplorable as it may sometimes be, that constitutes "extreme and outrageous" conduct.

939 F.2d at 1143.

We have recognized that the rough-and-tumble of daily business life "contemplate[s] a degree of teasing and taunting that in other circumstances might be considered cruel and outrageous." *Id.* (quoting N. PAGE KEETON ET AL., PROSSER & KEETON ON TORTS (5th ed. 1984 Supp.1988)). The tragic heroism of Willy Loman in THE DEATH OF A SALESMAN and the furious sales competition of David Mamet's GLENGARRY GLENROSS suggest that salesmen such as Deus come to tolerate management pressures that many would consider to be beyond the pale.

In *Wilson,* the employer assigned the plaintiff, an executive with thirty years' experience, to janitorial duties with the evident intent to target him for specific humiliation. The court suggested that the employer's conduct was outrageous if it had "*intentionally and systematically* set out to humiliate him in hopes that he would quit." *Wilson,* 939 F.2d at 1145. This "mean-spirited" attempt to "demean" and "humiliate" Wilson provided him with a legitimate claim. The employer also reassigned his duties, created a long-term program to introduce younger persons into sales and management positions, and refused to grant his request for a transfer. Other managers refused to work with him. Nonetheless, absent the demotion of Wilson to janitor, the other actions were insufficient, standing alone, to be considered extreme and outrageous.

In *Dean,* the plaintiff, a woman, was a bank employee. In order to prevent her transfer to a superior position, the defendant placed bank checks in plaintiff's purse in order to make it appear that she was a thief. There were a number of other allegations of impropriety, including rejecting her

transfer request on the ground that "women usually don't go into that department" and selecting a lesser qualified man instead. Management transferred her from desk to desk for no reason. Plaintiff was required to do more work than other clerks and was "subjected to unfair harassment." Management also used "special" reviews (that only the plaintiff received) to downgrade her performance. *See Wilson,* 939 F.2d at 1143. Despite this litany of unseemly conduct by defendant, however, the court noted that it was only the "check incidents" that made the conduct outrageous.

Allstate's actions lack the special conditions removing *Dean* and *Wilson* from "the realm of an ordinary employment dispute." As *Dean* and *Wilson* indicate, an employer may call upon an employee to do more work than other employees, use special reviews on a particular employee and not on others to downgrade his performance, and institute long-range company plans to move younger persons into sales and management positions without engaging in extreme and outrageous conduct. *Wilson,* 939 F.2d at 1143-45. Deus has not demonstrated that his managers intended to do anything other than provoke or motivate him into performing at the levels he had previously shown he was capable of, show him the benefits of the NOA program, and make him and all the other agents aware of what changes could be expected from the NOA program.

Each of Deus's grievances was a foreseeable result of the application of Allstate's new NOA system. Allstate established and executed neutral rules that had predictable consequences for Deus and other established agents. Allstate warned COA agents that the marketing advantages of the NOA offices would increase competition for the COA's. As agents left the COA's, the most desirable NOA locations would be taken by those agents who first elected to enter the NOA program. The agents were warned that as agents left company offices to go into NOA offices, it could become necessary to close and/or consolidate those offices or move the remaining agents to more productive locations. As the number of agents in a particular office decreased, support services also would be reduced.

The evidence indicates that Allstate withdrew support from Walsworth, who was already an NOA. Allstate believed that its future profitability was linked to the development of the NOA system. Thus, as Ivy testified, the introduction of the NOA caused difficulty for many of the established agents. To the extent that Allstate manipulated peer groups, it was in order to demonstrate the

superior production of NOA's over COA's, not to harass Deus for any personal reason.

Deus was not targeted for specific abuse. The fact that he saw himself as a scapegoat was secondary to Allstate's permissible purpose of furthering its business goals. "There is no occasion for the law to intervene in every case where some one's [*sic* ] feelings are hurt." RESTATEMENT § 46, comment d.

### 3.

Deus contends that even if there were no specific instances of Allstate's outrageous conduct, a repeated pattern of minor annoyances can rise to an actionable level. "This has been characterized as a sliding scale approach under which even relatively "mild' harassment may become tortious if continued over a substantial time period." *Bustamento v. Tucker,* 607 So.2d 532, 538 (La.1992). Through repeated harassment, minor isolated acts may create a "hostile work environment" amounting to outrageous conduct.

Cases in Louisiana and elsewhere recognizing hostile environment claims have limited the tort's reach to harassment falling outside the standard friction arising from an employment relationship and infringing on issues unrelated to employment and protected by statutory and constitutional rights. In *Bustamento,* the outrageous conduct was sexual harassment and threats of physical violence. In *Contreras v. Crown Zellerbach Corp.,* 88 Wash.2d 735, 565 P.2d 1173, 1174 (1977), the plaintiff was an Hispanic subjected to continuous "humiliation and embarrassment by reason of racial jokes, slurs, and comments." In *Alcorn v. Anbro Eng'g, Inc.,* 2 Cal.3d 493, 86 Cal.Rptr. 88, 468 P.2d 216, 218 (1970), a black employee was subjected to "vituperative language" and "vindictive conduct" by his white supervisor as a result of his race.

In each case recognizing the hostile environment, there was some factual element that took the case beyond the scope of an ordinary employment dispute. In each case, the harassment dealt with issues unrelated to the plaintiff's work performance and touched upon traditionally protected subjects. There are no such circumstances here.

### 4.

An employee may be entitled to greater protection against "insult and outrage by a supervisor

with authority over him than if he were a stranger." *White,* 585 So.2d at 1210. "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." *Id.*; RESTATEMENT § 46, comment e. Nonetheless, defendants will not be liable "for mere insults, indignities, or annoyances that are not extreme or outrageous."

In *Hall v. May Dep't Stores Co.,* 292 Or. 131, 637 P.2d 126 (1981), the plaintiff, a young sales clerk, was accused of stealing money from her register. She was questioned by the defendant's head of security who, admittedly without adequate proof to take legal action, threatened arrest and imprisonment if she did not admit to her alleged embezzlement. The court noted, "In many respects employment remains an arms-length adult relationship between parties intent on securing divergent rather than joint interests. But an additional element appears when an employee is subjected to severe mental and emotional distress, not as an incidental effect of an unpleasant confrontation, but intentional as a cold blooded tactic of interrogation upon scanty evidence." *Id.* 637 P.2d at 133.

Similarly, in *Maggio v. St. Francis Medical Ctr.,* 391 So.2d 948 (La.App.2d Cir.1980), *writ denied,* 396 So.2d 1351 (1981), the supervisor intentionally caused an employee to become complicit in illegal activity and to breach an ethical duty. In *Engrum v. Boise S. Co.,* 527 So.2d 362 (La.App. 3d Cir.1988), the plaintiff stated a claim for intentional infliction of emotional distress where a payroll check was intentionally altered by the company, resulting in the employee's arrest.

In the current case, however, Deus has not explained how Allstate abused its position of trust or power. His argument is that agents who did not enter the NOA program would have a difficult time meeting their production goals. His complaints are nothing more than dissatisfaction with Allstate's marketing strategy. Absent evidence that Allstate abused its position of authority, he is not entitled to greater protection than is the average employee engaged in an employment squabble.

5.

Under *White,*

[t]he defendant's knowledge that plaintiff is particularly susceptible to emotional distress is a factor to be considered. But the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt is not enough. It follows that unless the actor has knowledge of the other's particular susceptibility to emotional distress, the actor's

conduct should be judged in the light of the effect such conduct would ordinarily have on a person of ordinary sensibilities.

*White,* 585 So.2d at 1210. "Thus the conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know." RESTATEMENT § 46, comment f.

Deus has presented no evidence that Allstate was aware of his pre-existing health problems, nor that Allstate had any reason to believe that he would react especially negatively to the impact of its actions. In fact, Deus testified that he did not tell any supervisors of his deteriorating physical and mental condition, because he considered his medical condition to be his "personal affairs" and "a private thing." He testified that he knows of no way that his supervisors could have discovered his medical state. He never mentioned his bipolar disorder, the intensity of his tinnitus, or that he was under a physician's care and on medication.

Therefore, Allstate's alleged actions properly should be evaluated according to the effect their conduct would have on a person of ordinary sensibilities. Applying this standard, we affirm the district court's ruling for the reasons indicated above.

C.

Allstate's alleged mistreatment of Deus was not sufficiently thoughtless to rise to the level of outrageousness necessary to impose liability under Louisiana law. As a result, we need not consider the causation and intent elements under *White.* Failing to find a factual predicate necessary to justify a finding of outrageous conduct by Allstate, we affirm the district court's grant of Allstate's rule 50(a) motion for judgment as a matter of law.

IV.

Deus contends that Allstate's behavior constituted a breach of his employment contract. He contends that (1) Allstate's actions constituted wrongful discharge or constructive termination; (2) Allstate breached a provision of the written contract to provide fair procedures to evaluate his performance; and (3) Allstate breached its contractual obligation to provide in good faith all necessary assistance and support for Deus to sell insurance from his company office. The district court dismissed all three claims under rule 50(a), holding that Louisiana does not recognize the

concept of constructive termination and that any attempt by an employer to limit its right to terminate an at-will employee violates public policy. The district court erred in holding that Louisiana does not recognize a claim for "constructive termination," *see Clemons v. Blache,* 501 So.2d 1020, 1022 (La.App.2d Cir.1987); *Carlson v. Ewing,* 219 La. 961, 54 So.2d 414 (1951), but it did not err in holding that the alleged limits on Allstate's power to terminate Deus were invalid.

A.

Allstate contends that Deus's contract was an at-will contract terminable at any time by either the employer or employee; thus, he has no valid enforcement action. Deus contends that Allstate voluntarily limited its power to treat him as an at-will employee.

The Louisiana Civil Code provides for two types of contracts for hire: a contract for a fixed time, *see* LA.CIV.CODE art. 2746, and the contract of a servant terminable at the will of the parties, *see* LA.CIV.CODE art. 2024, 2747. Employees for a fixed time are considered not as hired out but "as having sold their services."

Employment contracts cannot be binding for a term longer than ten years. The only damages available for breach of contract is the salary for the unexpired term. *See* LA.CIV.CODE art. 2749. Unless the employment contract is for a definite period of time, there is no enforceable action for damages under Louisiana law, as the contract can be terminated at the will of either the employee or the employer. *Brannan v. Wyeth Labs.,* 526 So.2d 1101, 1104 (La.1988).

Generally, lifetime employment contracts are unenforceable in Louisiana, unless the employee has given some "valuable consideration" other than performance of the work entailed by his job. *Id.* There are no cases identifying what consideration will be valid to create a lifetime contract. The cases suggest, however, that valid consideration includes such activities as where an employee closed out an ongoing business to do work of the same nature for someone else; gave his employer a secret formula for manufacturing a special product; or settled a personal injury claim against his employer in return for lifetime employment. *See Pitcher v. United Oil & Gas Syndicate,* 174 La. 66, 139 So. 760, 761 (1931) (citing annotation at 35 A.L.R. 143-49).

Deus asserts that he proffered consideration by accepting a specified commission rate from

Allstate that he claims is lower than the rates given by some insurance companies and because he agreed to the terms of Allstate's contract giving Allstate ownership over any of the accounts he developed, instead of Deus's retaining ownership of the accounts. This, however, is a standard employment contract, not the type of "special consideration" necessary to invoke that exception.

When Deus went to work for Allstate, he was essentially unemployed and had no prior experience in the insurance business. He had no ownership of any accounts to sacrifice and no "following," and he did not bypass any alternate commission, such as another job offer, in exchange for employment with Allstate. Obviously, any alleged detriment he incurred for working for Allstate was offset by the gains from working under Allstate's sign. Since Deus has returned no valuable consideration in exchange for Allstate's limiting its right to terminate him at will, under Louisiana law he has no legal claim for damages, as his alleged lifetime contract is unenforceable.

B.

Deus argues that Allstate violated the terms of the contractual agreement requiring that he could not be terminated for unsatisfactory work unless Allstate first fairly evaluated his work through the corrective review process and gave him a reasonable opportunity to correct any problems. He contends that that provision limited Allstate's power to treat him as an at-will employee. Deus argues that by forcing him to quit and improperly downgrading his performance, Allstate breached this provision and constructively terminated him.

This argument founders on the same rocks as does his previous claim. As this was a lifetime contract, this provision of the contract was enforceable only if Deus returned some additional consideration for this alleged limit on Allstate's power to terminate his employment at will. *Id.* He has provided no evidence that he did so. As one subsection of an invalid lifetime contract, the provision is invalid. Accordingly, under Louisiana law, his contract with Allstate is terminable at will.

The cases cited by Deus to show that an employer has the right to alter its right to terminate an otherwise at-will employee are inapposite. The issue is whether an employer can unilaterally limit its right to terminate an employee at will, absent return consideration from the employee. The cases Deus cites demonstrate only that the employer can limit its plenary power, not that it can do so

unilaterally.

For instance, Deus quotes the lower court opinion in *Brannan* as stating that "[m]odification of this right to fire at will ... must be shown by a specific contract or agreement." He omits the parenthetical concluding that paragraph, however: "But see [*Simmons v. Westinghouse Elec. Corp.,* 311 So.2d 28 (La.App.2d Cir.1975) ], stating that the agreem ent must be supported by extra consideration." *Brannon v. Wyeth Labs.,* 516 So.2d 157, 164 (La.App. 5th Cir.1987), *modified on other grounds,* 526 So.2d 1101 (La.1988). Likewise, Deus's reliance on *Morgan v. Avondale Shipyards,* 376 So.2d 516 (La.App. 4th Cir.1979), and *Williams v. Delta Haven, Inc.,* 416 So.2d 637 (La.App.2d Cir.1982), is misplaced, as the language he quotes is *dicta,* and the opinion is silent on whether modification of the right to terminate at will requires additional consideration to be valid.

C.

Deus also argues that Allstate breached its implied duty to perform its contractual duties "in good faith." He contends that Allstate assumed an obligation to provide all necessary assistance, equipment, and services to help him succeed in the insurance market. He seeks general damages pursuant to LA.CIV.CODE arts. 1997 and 1998 for breach of an obligation of good faith and fair dealing pursuant to LA.CIV.CODE art. 1983.

We conclude that Deus has not demonstrated that Allstate breached any implied obligation of good faith in executing its part of the bargain. There is no evidence that the secretarial staff was reduced in bad faith, nor that any phone lines were cut, as he alleges, nor that any other services or support to his office were unfairly reduced.

Also untrue is Deus's claim that Allstate promised what appeared to be endless assistance to its agents. Even if a valid part of the agreement (the terms relied upon by Deus are drawn from a letter independent of the agreement and signed by Allstate alone), the provision upon which Deus relies does not guarantee assistance unlimited in scope or duration. Instead, the terms limit assistance to training and guidance.

Deus also claims that Allstate made "oral representations" concerning "job security." These arguments are precluded by the original compensation agreement that disallows any amendment made

without the requisite formalities.

Deus also is incorrect in saying that through "custom and practice" Allstate obligated itself to provide more support and assistance to Deus in his marketing efforts. There is no evidence that Allstate withdrew reasonable support services from Deus's office. Further, Louisiana courts have implied terms from "custom and performance" only where there is no contract. Here, not only does a written agreement exist, but it specifically disallows unwritten modifications.

According to Deus, Allstate's Human Resources Policy Statements Manual creates binding obligations. Lacking appropriate formalities, however, the manual cannot amend the written agreement. Furthermore, the manual notes that it does not give rise to any obligations on Allstate's part. Instead, it reserves the right for Allstate to depart from the company's standard disciplinary procedures at its discretion.

Deus also complains about inadequate secretarial help after the inception of the NOA program. But, during the time of these events, the office went from one secretary for six employees to one for five. Thus, there is no evidence that Allstate breached its duty to perform its part of the contract in "good faith."

V.

The district court granted summary judgment for Allstate on Deus's claim for worker's compensation benefits. We affirm.

LA.R.S. 23:1031 provides,

If an employee not otherwise eliminated from the benefits of this chapter, receives personal injury by accident arising out of and in the course of his employment, his employer shall pay compensation in the amounts, on the conditions, and to the person or persons hereinafter designated....

At the time Deus became disabled, LA.R.S. 23:1021 defined an accident as follows:

"Accident" means an unexpected or unforeseen event happening suddenly or violently, with or without human fault, and producing at the time objective symptoms of an injury.

Deus contends that Allstate has caused him two injuries that prevent him from returning to any type of gainful employment. He avers that he now suffers from debilitating tinnitus, a physical inner ear problem (causing "ringing" in the ears) that can be aggravated by stress. He says he also

suffers from manic depression, a mental problem originating from a chemical imbalance.

Under Louisiana law, for a non-physical occurrence or event to give rise to a compensable injury, it must be "precipitated by an accident, i.e., an unexpected and unforeseen event that occurs suddenly or violently." *Sparks v. Tulane Medical Ctr. Hosp. & Clinic,* 546 So.2d 138, 147 (La.1989). "[A] mere showing that a mental injury was related to general conditions of employment or to incidents occurring over an extended period of time, is not enough to entitle the claimant to compensation." *Id. Sparks* indicates that mental damage can be compensable in cases such as where the plaintiff watched a co-employee fall to death after the collapse of a scaffold, robbery and fear of imminent sexual abuse, or a co-employee's suicide. "[A]bsent an identifiable accident of this type, an employee's general allegation that he is unable to work due to stress or tension caused by working conditions would not give rise to a compensable claim." *Id.*

Deus has not identified any incidents dramatic enough to distinguish his case from any other employee dispute. He has not identified any specific incident that *Sparks* suggests would be sufficient to treat his case as more than stress or tension caused by general working conditions. Thus, he is not eligible for worker's compensation for his injuries.

VI.

Deus contends that Allstate abused its right to discipline him under his contract and disciplined him falsely with the intent to harm him. Also, Allstate disciplined Deus for a purpose for which the right was not granted: to breach its contract by forcing him to quit or become an NOA. The district court rejected this claim. We affirm.

The Louisiana abuse-of-rights doctrine applies only if one of the following conditions is met: (1) The rights were exercised "exclusively for the purpose of harming another or with the predominant motive to cause harm"; (2) an absence of "of a serious and legitimate interest that is worthy of judicial protection"; (3) using "the right in violation of moral rules, good faith or elementary fairness"; or (4) "exercising the right for a purpose other than that for which it was granted." *Illinois Cent. R.R. v. International Harvester Co.,* 368 So.2d 1009 (La.1979). Deus has not demonstrated that he has met any of the conditions necessary to establish a violation of the

abuse-of-rights doctrine.

Allstate was implementing new policies designed to increase revenues; its policies were neutrally conceived and neutrally applied. The fact that Deus was a casualty of these changes does not, without more, establish that Allstate abused its right to discipline Deus. *See Ballaron v. Equitable Shipyards,* 521 So.2d 481, 483 (La.App. 4th Cir.), *writ denied,* 522 So.2d 571 (La.1988).

## VII.

Deus contends that the district court abused its discretion by limiting him to three days to present evidence in response to Allstate's rule 50(a) motion. FED.R.EVID. 403 and 611(a) give the district court wide discretion in the management of its docket and the presentation of evidence. A party is not entitled, as a matter of right, to put on every witness he may have. *Manbeck v. Ostrowski,* 384 F.2d 970 (D.C.Cir.1967), *cert. denied,* 390 U.S. 966, 88 S.Ct. 1077, 19 L.Ed.2d 1170 (1968). In the management of its docket, the court has an inherent right to place reasonable limitations on the time allotted to any given trial. *United States v. Reaves,* 636 F.Supp. 1575 (E.D.Ky.1986).

The district court forewarned the parties that each would have three days to present its case. The record indicates that Deus improvidently squandered much of his time through the presentation of repetitive and immaterial evidence. He has pointed to no evidence that he was unable to present that would have aided his case in any significant way. The court did not exceed its discretion in limiting the amount of time the parties could have to make their cases.

## VIII.

## A.

The law firm of Voorhies and Labbé ("V & L") served as Deus's original attorneys. The contract signed with Deus gave V & L one-third of the gross amount collected, after deduction of expenses. Deus also was responsible for any expenses that V & L incurred on his behalf. V & L worked on Deus's case for two and one-half years. Before the case was completed, however, H. Lee Leonard and Keitha A. Leonard left V & L to form a separate practice. Shortly thereafter, Deus requested that his file be transferred to the Leonards' law firm.

V & L filed an intervention to collect on the retainer contract.  On July 10, the court set aside the jury verdict and granted Allstate's rule 50(a) motion.  This ruling, however, did not address V & L's pending intervention.  Deus appealed on July 28, and V & L did not appeal until August 14, beyond the thirty-day deadline for filing appeal.

V & L contends, and the record reflects, that the district court did not resolve the intervention issue in its July 10 order.  Thus, o n September 9, V & L filed a motion for summary judgment, seeking to recognize all sums due it under the contract with Deus, along with a motion to amend the original judgment to include the disposition of its claim against Deus.  V & L also sought recognition of its lien rights against any settlement pursuant to LA.R.S. 37:218.

On December 3, the court grant ed V & L's summary judgment motion, holding that, as a matter of law, there was no issue of material fact and that V & L had acquired an interest in the suit pursuant to § 37:218.  The court awarded V & L a minimum of $7,500 in costs from Deus under the contract and deferred determination of any additional costs and attorneys' fees due V & L until there was a final resolution by this court in the principal action.

The court also denied V & L's motion to amend its order, because the intervention issue was collateral for the purpose of the finality of the judgment.  The court added that if this court reinstated the jury verdict against Allstate, Allstate would be required t o make any checks payable jointly to Deus and V & L.  On December 18, Deus timely appealed, *inter alia,* the judgment of July 10 and the ruling of December 3.  On December 30, V & L filed a notice of appeal, seeking review of, *inter alia,* the July 10 and December 3 orders.

B.

An order that adjudicates fewer that all the claims or rights of fewer than all the parties does not terminate the action as to any claims or parties.  FED.R.CIV.P. 54(b);  *Borne v. A & P Boat Rentals No. 4,* 755 F.2d 1131, 1133 (5th Cir.1985).  Under *Budinich v. Becton Dickinson & Co.,* 486 U.S. 196, 200, 108 S.Ct. 1717, 1721, 100 L.Ed.2d 178 (1988), "an unresolved issue of attorney's fees for the litigation in question does not prevent judgment on the merits from being final."

A claim for attorneys' fees generally is not part of the merits to which the fees pertain.

Attorneys' fees traditionally have been considered to be an element of "costs" awarded to the prevailing party, which are not generally treated as part of the merits judgment. *Id.* "Such an award does not remedy the injury giving rise to the action...." *Id.* Where, however, the demand for attorney's fees is itself part of the merits, the general rule does not apply. *Id.; see also Buchanan v. Stanships, Inc.,* 485 U.S. 265, 268, 108 S.Ct. 1130, 1131, 99 L.Ed.2d 289 (1988) ("a different issue may be presented if expenses of this sort were provided as an aspect of the underlying action....").

"[O]rdinary costs and attorneys' fees are treated similarly, as collateral matters for purposes of finality." *Samaad v. City of Dallas,* 922 F.2d 216, 218 (5th Cir.1991). A collateral action is one "which is subsidiary to another action." BLACK'S LAW DICTIONARY 261 (6th ed. 1990). Claims for attorneys' fees and costs are collateral because they are dependent on, and usually await, a determination of the claim on the merits. A claim for attorneys' fees or costs generally is not an independent claim for relief essential to the outcome of the case as a whole.

In the current matter, however, it is not accurate to classify V & L's claim as one for attorneys' fees in the sense that *Budinich* uses that term. V & L's intervention is an independent claim for damages under its retainer contract with Deus; thus, it "does ... remedy the injury giving rise to the action...." *See Budinich,* 486 U.S. at 200, 108 S.Ct. at 1721. As far as V & L is concerned, it is "the only game in town"; that is to say, it is an independent claim of one party against another that happens to be for fees earned and is brought in the form of an intervention in a pre-existing suit.

Where an attorney—and especially a former attorney—seeks judgment against his client, it should be considered a claim for substantive relief on the merits, not a collateral issue of attorneys' fees. Thus, we conclude that V & L's intervention does not seek "attorneys' fees" under *Budinich* and that the intervention falls outside *Budinich* 's brightline rule classifying attorneys' fees issues as collateral.

Moreover, V & L's rights are not contingent on the outcome of the litigation, as was the case with the fees in *Budinich.* Its right to recover costs from Deus vested at the moment Deus signed the contract for representation. V & L's intervention sought judgment on its substantive right to satisfaction of the retainer contract, and it sought damages and a lien against Deus's recovery in the

case. Thus, its right to satisfaction under the contract was independent of, not collateral to, Deus's cause of action. It is not, as was the fee claim in *Budinich,* the result of fee-shifting between prevailing and losing parties.

Also, until the district court ruled on V & L's intervention, under rule 54(b) no final judgment could be entered. Thus, the July 10 order was merely interlocutory, and final judgment was not entered until December 3 when the court granted the intervention. This means that all parties seeking review have timely noticed appeals from the matters encompassed by the July 10 order and the December 3 judgment.

Our holding that V & L's intervention is not a collateral claim for attorneys' fees does not contradict *Budinich* or circuit precedent applying *Budinich.* There, plaintiff sued to recover employment compensation allegedly due. Under Colorado law, the prevailing party was entitled to reasonable attorneys' fees as part of the costs of the action. *Budinich,* 486 U.S. at 197, 108 S.Ct. at 1718. In *Budinich,* unlike this case, attorneys' fees claims were collateral and vested only after a decision on the merits of the employment claim.

Similarly, in *White v. New Hampshire Dep't of Employment Sec.,* 455 U.S. 445, 451, 102 S.Ct. 1142, 1166, 71 L.Ed.2d 325 (1982), the Court held that a request for attorneys' fees under 42 U.S.C. § 1988 did not seek "reconsideration of matters properly encompassed in a decision on the merits." The Court concluded that a request for attorney's fees under § 1988 raises legal issues "separate from the decision on the merits—an inquiry that cannot even commence until one party has "prevailed.' " *Id.* at 451-52, 102 S.Ct. at 1166-67.

Our cases have limited *Budinich* 's brightline rule to similar situations. In *Samaad,* 922 F.2d at 218, for instance, we held that "ordinary costs and attorneys' fees are treated similarly, as collateral matters, for purposes of finality." There, the party that lost the judgment was seeking to avoid the requirement of FED.R.CIV.P. 59(e) that costs be taxed to the losing party. A motion to reallocate costs had no effect on the underlying judgment, and therefore it was treated as collateral under *Budinich.*

Our holding that *Budinich* does not require V & L's intervention to be treated as a collateral

issue is also consistent with decisions in other circuits that have considered the issue. In *Vargas v. Hudson County Bd. of Elections,* 949 F.2d 665, 667 (3d Cir.1991), the court held "that attorney's fees owed to a third-party were an element of damages sought by an indemnitee" and that a final judgment could not be entered until those fees were quantified.

The court found that the litigation actually consisted of "two separate, but interrelated, claims." The first claim was a class action by civil rights plaintiffs against Gerald McCann and his staff, seeking damages and attorneys' fees under § 1988. The McCann defendants had a general liability policy with National Union Fire Insurance Company on which National Union refused to pay. The second claim was brought by McCann against National Union seeking indemnification for damages and attorneys' fees that might be due the class plaintiffs, as well as attorneys' fees expended by the McCann defendants in defending the class action and, finally, attorneys' fees expended by those defendants in connection with the suit brought against National Union.

The *Vargas* court held that McCann's claim against National Union was not a collateral claim for attorneys' fees under *Budinich.* "The McCann defendants sought recovery of the class plaintiffs' fees as an element of damages against National Union and not as a prevailing party in the litigation." *Id.* at 670. Thus, the attorneys' fees were the purpose of the litigation against National Union. Had McCann been proceeding under a state statute awarding attorneys' fees in the litigation against National Union, it would have been a *Budinich* claim. *Id.* at 669.

Instead, the McCanns were seeking a construction of his insurance policy with National Union to indemnify him for expenses associated with the litigation against the civil rights plaintiffs. The expenses incurred by the civil rights plaintiffs were relevant to the calculation of the amount the National Union was required to indemnify McCann. But the expenses "for the litigation" with the civil rights plaintiffs were distinct from the expenses "for the litigation" with National Union. Thus, the expenses sought were not collateral to the civil rights litigation.

In *Justine Realty Co. v. American Nat'l Can Co.,* 945 F.2d 1044, 1047-48 (8th Cir.1991), the court decided that *Budinich* "does not hold that fees provided by the contract and incurred in pre-litigation performance of the contract, and thus part of the substance of the claim (and therefore

not "for the litigation'), can never be compensation for injury and part of the merits." The court noted that "in some instances fees are substantively part of a plaintiff's compensatory damage and are necessary to remedy the damage or injury sustained by a plaintiff." *Id.* at 1048.

The court considered the example of an action against an insurer for failure to defend an underlying action as required by an insurance policy; plaintiff's costs and fees in defending the underlying action would constitute part of its damages. An action brought to recover a deficiency due after foreclosure on mortgaged property would be treated analogously: Part of plaintiff's damages could be fees incurred in the foreclosure proceedings as provided in the underlying documents on which the separate foreclosure suit was brought. The court concluded, "Fees of this sort are substantively a part of plaintiff's compensation, and go to the merits of the claim rather than being "for the litigation in question,' or "attributable to the case.' " *Id.* at 1048.

In *Justine Realty,* the court distinguished between the costs incurred in sending the certified letters notifying American Can of its default on its lease, and any pre-litigation fees for legal advice concerning proper invocation of the terms of the settlement agreement. *Id.* at 1049. Under the contract between the parties, however, any fees incurred as a result of the litigation with American Can would be collateral. The court admitted that the recoverable costs were "probably minimal," but Justine Realty was entitled to them.

The current case is similar to *Vargas* and *Justine Realty.* V & L has an independent claim on the merits against Deus under its contract. V & L is not seeking damages or attorneys' fees associated with filing its current intervention motion, but is seeking damages due under its performance of the retainer contract before Deus replaced it. As such, its motion is not a collateral issue, as it is not "for the litigation in question" as contemplated by *Budinich.*

The district court's judgment could not have been final until it addressed V & L's intervention. Thus, final judgment was not entered until the December 3 judgment was rendered. Consequently, the district court erred by refusing to amend its earlier judgment to grant V & L costs.

## C.

The court also did not err in granting V & L an interest in the case pursuant to LA.R.S.

37:218. That section awards to an attorney an interest in litigation if the agreement is signed by the parties and recorded with the appropriate clerk of court . V & L did so, and therefore the district court did not err by awarding it an interest in the suit.

IX.

A.

At the same time that Deus filed suit in federal court, he filed a companion suit in the 15th Judicial District Court for the Parish of Lafayette, State of Louisiana. In addition to Allstate, the amended complaint named Larry Rhodes and Scott Raley, two of Allstate's managers, as individual defendants. Deus also added fraud and fraudulent misrepresentation as additional causes of action. While this appeal was pending, the district court enjoined the state court proceedings as to all defendants and all claims.

We review the issuance of the injunction for an abuse of discretion. *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 3561, 45 L.Ed.2d 648 (1975). We conclude that the district court properly enjoined the state court claims against Allstate on the claims that have already been fully litigated, but abused its discretion by enjoining the fraud claims against all defendants.

B.

Allstate contends that the All Writs Statute, 28 U.S.C. § 1651(a), and the relitigation exception to the Anti-Injunction Act, 28 U.S.C. § 2283, permit the district court to enjoin state court proceedings relitigating issues resolved by the district court. Allstate contends that it was entitled to equitable relief pursuant to 28 U.S.C. § 2283 because there is no adequate remedy in the state court that would provide the relief sought. Louisiana does not recognize the principle of collateral estoppel, and as applied in Louisiana at the time, *res judicata* might not protect the individual defendants, Rhodes and Raley, from being subjected to relitigation of the issues and factual allegations decided by the district court.

The All Writs Statute and the relitigation exception to the Anti-Injunction Act permit a federal court to issue an injunction to prevent state litigation of issues or claims presented to and decided by it "to protect or effectuate its judgments." 28 U.S.C. § 2283; *Chick Kam Choo v. Exxon*

*Corp.,* 486 U.S. 140, 147, 108 S.Ct. 1684, 1689, 100 L.Ed.2d 127 (1988); *Royal Ins. Co. of Am. v. Quinn-L Capital Corp.,* 3 F.3d 877, 883 (5th Cir.1993). The bar on relitigation of issues in state court applies to identical claims or causes of action. *Texas Employers Ins. Ass'n v. Jackson,* 862 F.2d 491, 501 (5th Cir.1988) (en banc), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1932, 104 L.Ed.2d 404 (1989). "It is founded in the well-recognized concepts of *res judicata* and collateral estoppel." *Chick Kam Choo,* 486 U.S. at 147, 108 S.Ct. at 1690. Accordingly, Deus's claims that have been actually considered and rejected by the district court are barred by the relitigation exception. *Id.* at 148, 108 S.Ct. at 1690; *see also Royal Ins.,* 3 F.3d at 883 (claims actually denied by the district court "fall[ ] squarely within the "protect or effectuate its judgments' exception to the Act").

## C.

Deus contends that even if the claims actually litigated were properly enjoined, the district court erred by extending the injunction to protect Allstate from claims not actually litigated and for protecting Rhodes and Raley, who were not parties in the first suit. Deus sought to amend his complaint to include this claim and the defendants, but the district court denied his motion. Having denied Allstate's motion to amend, the court erred in enjoining the fraud and fraudulent misrepresentation claims against Allstate, Rhodes, and Raley.

"[A]n essential prerequisite for applying the relitigation exception is that the claims or issues which the federal injunction insulates from litigation in state proceedings actually have been decided by the federal court." *Chick Kam Choo,* 486 U.S. at 148, 108 S.Ct. at 1690. This "prerequisite is strict and narrow." *Id.* Principles of comity and federalism caution us against obstructing with state court proceedings. The Constitution devises a "dual system of federal and state courts," and the prohibitions of § 2283 are "[d]ue in no small part to the fundamental constitutional independence of the States." *Id.* at 146, 108 S.Ct. at 1689.

Because the district court denied Deus's petition to amend his complaint, he did not have an opportunity to litigate his fraud claims. As a result, he cannot be enjoined from arguing them to the state court. Had Deus not attempted to amend his complaint, an injunction probably would have been warranted under principles of *res judicata* and collateral estoppel embodied in § 2283. *See Chick*

*Kam Choo,* 486 U.S. at 147, 108 S.Ct. at 1690. Under *Jackson,* "claim" is defined broadly to include "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *Jackson,* 862 F.2d at 501 (adopting definition of RESTATEMENT (SECOND) OF JUDGMENTS § 24). Thus, any claims that he did not try to assert could have been enjoined.

## X.

## A.

During most of the discovery process and throughout the trial, the court record was sealed. The court closed the trial proceedings and refused to allow any persons other than the litigants to observe. Lane was present with his attorney on the first day of trial but, at Allstate's request, was ordered to leave the courtroom. NNOAC and Lane filed a motion to intervene in order to unseal the record. The district court denied the motion, claiming it lacked jurisdiction after the appeal was taken.

The court erred in holding that it lacked jurisdiction to grant the intervention, as the July 10 order was not a final judgment. Thus, the district court retained jurisdiction until the final judgment was issued on December 3.

Having determined that the district court incorrectly decided that it lacked jurisdiction, we usually would remand for the district court to consider the intervention on the merits. As a matter of law, however, it would be an abuse of discretion to grant the intervention in this case. Therefore, reviewing the merits, we affirm the denial of the motion to intervene.

## B.

FED.R.CIV.P. 24 establishes the criteria for intervention:

(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

(b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact

in common.

The intervention rule is intended to prevent multiple lawsuits where common questions of law or fact are involved but is not intended to allow the creation of whole new lawsuits by the intervenors. *Washington Elec. Coop v. Massachusetts Mun. Wholesale Elec. Co.,* 922 F.2d 92 (2d Cir.1990). The purpose of intervention is to admit, by leave of court, a person who is not an original party into a proceeding. The intervening party then becomes a "party" for the purpose of protecting some right or interest alleged by the intervenor to be affected by the proceeding. *In re Willacy County Water Control & Improvement Dist. No. 1,* 36 F.Supp. 36 (S.D.Tex.1940).

Lane and NNOAC have no rights or claims that they wanted the district court to adjudicate. The only purpose of the attempted intervention was to gain access to documents and testimony that are subject to the protective order. The desire to intervene to pursue the vacating of the protective order and/or the unsealing of the record is not a justiciable controversy or claim, absent some underlying right creating standing for the movants. Therefore, the reason for the requested intervention is not in accord with the purposes of rule 24.

For instance, in *Cunningham v. Rolfe,* 131 F.R.D. 587 (D.Kan.1990), the court found that permissive intervention was not appropriate where the applicants were merely trying to gain access to discovery materials generated in an earlier products liability suit for use in their own products liability case against the same defendant. In the absence of a claim or defense needing protection, the lack of an alternate remedy for NNOAC is of no consequence.

Intervention generally is not appropriate where the applicant can protect its interests and/or recover on its claim through some other means. *Diaz v. Southern Drilling Corp.,* 427 F.2d 1118 (5th Cir.), *cert. denied,* 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970). Lane is already participating in a lawsuit against Allstate in federal court in Nevada. Thus, he can protect any interest he has in these materials by filing a discovery request in that case.

In summary, NNOAC and Lane have no personal interest affording them standing to intervene. As a matter of law, therefore, the intervention motion is denied.

XI.

Deus was a casualty of Allstate's need to keep up with competition. Deus was destined to fail in his efforts to keep doing business the old way. We AFFIRM the district court's rulings on everything except that we VACATE the injunction against the state court suit and the grant of V & L's motion to intervene and the award to V & L of an interest in the litigation. We enter judgment on the attempted intervention of NNOAC and Lane, DENYING the motion to intervene.