**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 7 2000**

**PATRICK FISHER**
**Clerk**

UNITED STATES COURT OF APPEALS
TENTH CIRCUIT

I.D.G., INC.,

    Plaintiff-Appellant,

v.

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY, sued as:
St. Paul Fire and Marine Insurance
Company, The,

    Defendant-Appellee,

v.

DARRELL BURSON,

    Third-Party-Defendant.

No. 99-5067

(D.C. No. 97-CV-799-B)
(N.D. Okla.)

---

**ORDER AND JUDGMENT** *

---

Before **TACHA** and **BRISCOE** , Circuit Judges, and **ROGERS** , Senior District
Judge. **

    Plaintiff I.D.G., Inc. (IDG) appeals from the district court's grant of

---

    * This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

    ** The Honorable Richard D. Rogers, Senior United States District Judge
for the District of Kansas, sitting by designation.

summary judgment in favor of defendant St. Paul Fire and Marine Insurance Company (St. Paul). IDG claimed that St. Paul breached the terms of its commercial general liability insurance contract with IDG by failing to defend IDG and one of its corporate officers against litigation filed by a minority shareholder and former employee of IDG. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

IDG is an Oklahoma corporation with its principal place of business in Tulsa. Although the record on appeal is less than clear, it appears that IDG was formed by Rupert Brent Johnson, the majority stockholder, and Darrell Burson, a minority stockholder, for the purpose of developing and selling computer software. After IDG's formation, Johnson worked as an officer and director of IDG. Between January 1, 1993, and September 8, 1993, Burson worked as an employee of IDG.

Approximately six months after leaving his employment with IDG, Burson filed suit against IDG and Johnson in Oklahoma state court. In his first claim for relief, Burson alleged that he was entitled to unpaid wages from IDG in the amount of $3,807.69. In his second claim for relief, Burson alleged that he was "a co-inventor of a series of computer programs," collectively referred to as "SuperVision," that he and Johnson had "entered into an agreement for the

2

division of royalties on SuperVision," and that IDG and Johnson had "refused to turn over to [him] the amount of royalties due on the SuperVision project." App. at 148. In connection with this claim, Burson alleged IDG and Johnson were "indebted to [him] in an amount in excess of $10,000." Id. In his third claim for relief, Burson alleged he had "an ownership interest in SuperVision," which IDG and Johnson had converted to their own use and for which they had refused to compensate Burson. Id. at 149. Burson alleged he was "entitled to compensation in an amount in excess of $200,000" on this claim. Id. In his fourth claim for relief, Burson alleged that, as a shareholder of IDG, he was seeking "to enforce rights belonging to IDG, which IDG ha[d] failed and refused to enforce on its own behalf." Id. at 149. More specifically, Burson alleged that Johnson, "as president and director of IDG, transferred various corporate assets of IDG to non-employees for little or no consideration" and "caused corporate funds to be used to pay personal obligations and debts of Johnson." Id. In his fifth and final claim for relief, Burson alleged that Johnson, "with intent to defraud [Burson], made false representations to [Burson] concerning the future disbursements of the proceeds received from SuperVision," which Burson acted upon to his detriment. Id. at 150.

Burson amended his state court petition on June 29, 1995, adding three additional claims against Johnson. In his sixth claim for relief, Burson alleged

3

that Johnson, "with the intent [to] defraud the creditors and shareholders of IDG," formed a corporation named Global Interface Solutions, of which Johnson was the sole shareholder, and then "fraudulently transfer[red] assets away from IDG to Global." Id. at 155. In his seventh claim for relief, Burson alleged that Johnson, "[b]y transferring or authorizing the transfer of IDG's assets to Global," had "committed a fraud upon the creditors and shareholders of IDG and, therefore, violated his fiduciary duty to IDG and the IDG shareholders." Id. at 156. In his eighth claim for relief, Burson alleged that "[t]he transfer or authorization of the transfer of IDG assets to Global was outside the scope of Johnson's authority as an officer or director of IDG," and that Johnson was therefore "personally responsible for the acts which he committed outside of the scope of his office." Id.

On July 15, 1997, Burson amended his complaint a second time. Burson's first and second claims for relief remained substantially unchanged. In his amended third claim for relief, Burson alleged that "[o]n August 8, 1991, [he] and . . . Johnson entered into a Stockholder's Agreement, which provided that certain information to which they were privy would be held by them in strict confidence and not disclosed to third parties unless necessary to further the business interests" of IDG. Id. at 159. Burson alleged that Johnson breached this agreement "by disseminating highly confidential information to . . . Global

4

including but not limited to sales records, customer lists, and marketing information," and that, as a result of Johnson's actions, the value of Burson's IDG stock had "become worthless." Id. In his amended fourth claim for relief, Burson continued to assert that, as a shareholder of IDG, he was seeking "to enforce rights belonging to IDG, which IDG ha[d] failed and refused to enforce on its own behalf." Id. at 160. Burson further alleged that Johnson "ha[d] engaged in a continuous pattern of violating his fiduciary and contractual duties to [IDG] with a view to enriching himself and the other Defendants." Id. Specifically, Burson alleged that Johnson (1) "transferr[ed] various corporate assets of [IDG] both directly and indirectly to third parties including himself and the other Defendants for little or no consideration," (2) "caus[ed] corporate funds to be used to pay his own personal obligations and debts," (3) diverted "corporate business opportunities to himself and the other Defendants," (4) paid "himself excessive compensation," (5) "wast[ed] corporate assets," (6) breached the Stockholder Agreement, and (7) converted "various physical assets of IDG together with money due to IDG." Id. In his amended fifth claim for relief, Burson continued to allege that Johnson "falsely represented" to him that "no funds were available with which to pay [Burson's] share of the SuperVision sales proceeds as previously agreed," and that Burson "acted upon the misrepresentations . . . to his detriment and ha[d] suffered damages in an amount in excess of $10,000.00 as a

5

result." Id. at 161. In his amended sixth claim for relief, Burson alleged that "Johnson caused IDG to transfer assets, directly and indirectly, to the other Defendants without receiving a reasonably equivalent value in exchange for the transfers," and did so "with the actual intent to hinder, delay or defraud" Burson. Id. at 162.

On July 30, 1997, IDG filed suit against St. Paul, its general liability insurance carrier, in Oklahoma state court, seeking damages arising out of St. Paul's alleged failure to defend IDG in Burson's state court action. In September 1997, St. Paul removed the action to the United States District Court for the Northern District of Oklahoma. St. Paul subsequently filed an answer and counterclaim, seeking a declaratory judgment that it did not have a duty to defend IDG against the claims asserted by Burson. The parties ultimately filed cross-motions for summary judgment. On March 1, 1999, the district court granted summary judgment in favor of St. Paul, concluding it had no duty under its policy with IDG to defend IDG or Johnson against the claims asserted by Burson.

## II.

We review de novo the district court's grant of summary judgment, applying the same standard utilized by the district court. See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Services, 165 F.3d 1321, 1326 (10th Cir.), cert. denied, 120 S. Ct. 53 (1999). Under that standard, summary

judgment is appropriate where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Further, as a federal court sitting in diversity, we must ascertain and apply Oklahoma law to reach a result that would have been reached had the case been decided in Oklahoma state court. See Leadville Corp. v. United States Fidelity & Guar. Co., 55 F.3d 537, 539 (10th Cir. 1995). We thus review the district court's interpretation of Oklahoma law de novo. See id. Finally, because the proper interpretation and construction of an insurance policy is a matter of law, we review the policy at issue de novo in order to determine whether it gave rise to a duty to defend. See Grovenburg v. Homestead Ins. Co., 183 F.3d 883, 885 (8th Cir. 1999) (holding that, because the interpretation and construction of an insurance policy is a question of law, the issue of whether a duty to defend exists under the policy is particularly amenable to summary judgment); Carney v. Village of Darien, 60 F.3d 1273, 1276-77 (7th Cir. 1995) ("The determination of whether an insurance company owes a duty to defend is a question of law reviewed de novo and without deference to the trial court.").

III.

*Insurer's duty to defend under Oklahoma law*

Under Oklahoma law, if the terms of an insurance policy are clear, consistent, and unambiguous, they are accepted in their ordinary sense and

enforced to carry out the parties' expressed intent.  Phillips v. Estate of Greenfield, 859 P.2d 1101, 1104 (Okla. 1993).  If, however, the contract terms are ambiguous, words of inclusion are liberally construed in favor of the insured, while words of exclusion are strictly construed against the insured.  Id.

In First Bank of Turley v. Fidelity & Deposit Ins. Co. of Maryland, 928 P.2d 298 (Okla. 1996), the Oklahoma Supreme Court addressed, at length, an insurer's duty to defend:

> The duty to defend is separate from, and broader than, the duty to indemnify, but the insurer's obligation is not unlimited.  The defense duty is measured by the nature and kinds of risks covered by the policy as well as by the reasonable expectations of the insured.  An insurer has a duty to defend an insured whenever it ascertains the presence of facts that give rise to the potential of liability under the policy.  The insurer's defense duty is determined on the basis of information gleaned from the petition (and other pleadings), from the insured and from other sources available to the insurer at the time the defense is demanded (or tendered) rather than by the outcome of the third-party action.

Id. at 302-04 (footnotes omitted).

*The policy language and IDG's contentions*

The commercial general liability insurance policy issued by St. Paul to IDG provided coverage for three general categories of liability: "Bodily injury and property damage liability," "Personal injury liability," and "Advertising injury liability."  App. at 125-26.  Included within the coverage was a duty on the part of

8

St. Paul "to defend any claim or suit for covered injury or damage made or brought against any protected person." Id. at 127.

IDG alleged that St. Paul's duty to defend was triggered by the filing of Burson's state court action. In particular, IDG alleged that its potential liability, as well as Johnson's potential liability, to Burson as a result of the lawsuit fell within the category of "Bodily injury and property damage," which was described in the policy as follows:

> **Bodily injury and property damage liability**. We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury, property damage, or premises damage that:
> * happens while this agreement is in effect; and
> * is caused by an event.

Id. at 125-26. According to IDG, the allegations asserted by Burson fell within the category of "property damage,"[1] which was defined under the policy in the following manner:

> * physical damage to tangible property of others, including all resulting loss of use of that property; or
> * loss of use of tangible property of others that isn't physically damaged.
> We'll consider all loss of use of damaged tangible property to happen at the time of the physical damage which caused it. And we'll consider all loss of use of undamaged tangible property to

---

[1] It is uncontroverted that Burson alleged neither "bodily injury," which was defined under the policy as "any physical harm . . . to the physical health of other persons," or "premises damage," which was defined under the policy as "property damage to premises that you rent, lease or borrow from others." App. at 126.

9

happen at the time of the event which caused it.

Id. at 126. Likewise, IDG asserted that the "property damage" alleged by Burson was the result of an "event," which the policy defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[2] Id. at 126.

*The district court's decision*

The district court concluded St. Paul had no duty to defend under the policy because, in its view, "the facts pertaining to Burson's claims against IDG and Johnson d[id] not constitute 'property damage' as defined under the policy." Id. at 1296. More specifically, the court concluded that Burson's claims did not involve tangible property, and did not involve the "loss of use" of such property. Id. at 1297. The court further held that Burson's alleged damages, which it concluded arose out of "intentional, wrongful conduct on the part of IDG and Johnson," were not caused by an "event," as that term was defined under the policy. Id. n.3. The court also rejected IDG's contention that it had a reasonable expectation of coverage based on St. Paul's defense of IDG in a previous lawsuit

---

[2] In connection with this limitation, the policy specifically excluded coverage for what it classified as "Intentional bodily injury or property damage":
" We won't cover bodily injury or property damage that's expected or intended by the protected person. Nor will we cover medical expenses that result from such bodily injury." Id. at 136.

filed in California.  Id. at 1300.  In particular, the court concluded that, because the pertinent policy language governing coverage was unambiguous, the doctrine of reasonable expectation was inapplicable.  Id. at 1300-01.

IDG now challenges each of the district court's determinations, as it must in order to obtain coverage under the policy.

*Was the property damage alleged by Burson caused by "event"?*

We turn first to the question of whether the damages alleged by Burson arose out of an "event," as that term is used in the policy.  As previously noted, the occurrence of an "event" is necessary to trigger coverage under the "Bodily injury and property damage liability" section of the policy.  The policy defines "event" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  App. at 126.  Although the policy does not define the term "accident," the Oklahoma Supreme Court has held that the term, when used in an insurance policy, must "be construed and considered according to common speech and common usage of people generally." United States Fidelity & Guar. Co. v. Briscoe, 239 P.2d 754, 756 (Okla. 1951). Thus, the Oklahoma Supreme Court has interpreted the term to mean "[a]n event that takes place without one's foresight or expectation; an undesigned, sudden and unexpected event, chance, contingency."  Id. (internal quotations omitted); see

also SCI Liquidating Corp. v. Hartford Fire Ins. Co., 181 F.3d 1210, 1216 (11th Cir. 1999) (concluding that identical policy language referred "to an unexpected happening rather than one occurring through intention or design"); Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 177 F.3d 210, 216 n.3 (3d Cir. 1999) (noting that, under New Jersey law, the term "accident," as used in an insurance policy, refers to an event neither expected nor intended by the insured); Fidelity & Guar. Ins. Underwriters, Inc. v. Everett I. Brown Co., 25 F.3d 484, 487 (7th Cir. 1994) (noting that, under Indiana law, the term "accident" generally refers to a sudden, unexpected event); Deus v. Allstate Ins. Co., 15 F.3d 506, 519 (5th Cir. 1994) (same under Louisiana law); Red Ball Leasing, Inc. v. Hartford Accident & Indem. Co., 915 F.2d 306, 309 (7th Cir. 1990) (discussing meaning of "accident" when used in liability insurance policy).

After reviewing the materials contained in the record on appeal, we have little trouble concluding that none of Burson's claims arose out of an "event." The primary thrust of Burson's lawsuit was that IDG and Johnson profited from the SuperVision software without paying him his fair share of the profits. Although IDG argues that none of Burson's claims required proof of intentional conduct on the part of IDG or Johnson, that alone is not sufficient to demonstrate that Burson's claims were the result of "accidents." In particular, even assuming that intent was not an essential element of any of Burson's claims, it is unclear

12

how IDG's alleged failure to pay Burson his share of the profits from the sales of SuperVision could be "an undesigned, sudden and unexpected event." To the contrary, we believe the alleged failure to pay must necessarily have been an intended or expected result and, therefore, Burson's claims did not arise out of an "event," as that term is defined in the policy.

*Did Burson's claims involve "loss of use"?*

Although our conclusion that Burson's claims did not arise out of an "event" essentially disposes of the matter, we note, as a point of further emphasis, that Burson's claims did not involve the "loss of use" of tangible property. Nowhere in his original or amended complaints did Burson allege that IDG or Johnson deprived him of the "loss of use" of any property. Rather, Burson alleged he was deprived of property in two specific respects: (1) IDG and Johnson failed to pay him salary/wages for work performed on their behalf during 1993; and (2) IDG and Johnson sold the SuperVision software to various third parties without paying him the royalties that were owed to him. Indeed, the central focus of Burson's lawsuit was that IDG and Johnson allegedly profited from sales of the SuperVision software without paying Burson, the alleged author of the software, his fair share. Clearly, this constitutes deprivation of property (i.e., money or profits), rather than "loss of use" of property.

13

Even if we were to assume Burson's claims encompassed the "loss of use" of the software itself, the record reflects that Burson retained a copy of the SuperVision software after leaving his employment with IDG. In other words, he retained a copy of this "property" and presumably could have sold it or done with it as he wished. Obviously, he was not deprived of the use of the software.

As for Burson's derivative claim, although it arguably involved the "loss of use" of property, it was IDG who was allegedly deprived of the use of its own property (which Burson alleged was improperly transferred by Johnson to others). Moreover, that claim was asserted solely against Johnson. There was no need for St. Paul to defend IDG with respect to that claim.

*Did Burson's claims involve "tangible" or "intangible" property?*

As IDG cannot satisfy either the "event" or the "loss of use" requirement of the policy, we need not address the difficult question of whether computer software falls within the policy's definition of "tangible property."

*Does the doctrine of reasonable expectations apply?*

In a final attempt to obtain coverage under the policy, IDG contends that, under the doctrine of reasonable expectations, St. Paul should have been obligated to defend against Burson's state court action. According to IDG, St. Paul

14

previously defended it in a 1992 California case involving claims similar to the Burson state court action. IDG argues that it was reasonable to expect coverage for the Burson action as well.

In Max True Plastering Co. v. United States Fidelity & Guaranty Co., 912 P.2d 861, 868 (Okla. 1996), the Oklahoma Supreme Court adopted the doctrine of reasonable expectations, but limited its application to "situations in which the policy contains an ambiguity or to contracts containing unexpected exclusions arising from technical or obscure language or which are hidden in policy provisions." As the Oklahoma Supreme Court specifically noted, "[i]f the doctrine is not put in proper perspective, insureds could develop a 'reasonable expectation' that every loss will be covered by their policy and courts would find themselves engaging in wholesale rewriting of insurance policies." Id.

Although IDG acknowledges the decision in Max True Plastering, it does not assert that the policy at issue is ambiguous. Nor, after review, do we find it to be so. As the district court correctly concluded, the doctrine of reasonable expectations has no application in this case. See Simpson v. Farmers Ins. Co., 981 P.2d 1262, 1266 (Okla. 1999) (rejecting application of doctrine of reasonable expectations where policy language at issue was clear and unambiguous).

15

IV.

The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge